[Cite as *Warnecke v. Whitaker*, 2011-Ohio-5442.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## PUTNAM COUNTY

CHARLES WARNECKE,

    PETITIONER-APPELLEE,               CASE NO. 12-11-03

    v.

TROY WHITAKER,                    O P I N I O N

    RESPONDENT-APPELLANT.

Appeal from Putnam County Common Pleas Court
Domestic Relations Division
Trial Court No. 2010 DV 304

**Judgment Affirmed**

Date of Decision: October 24, 2011

APPEARANCES:

    *Michael J. Short* for Appellant

    *Matthew A. Cunningham* for Appellee

**SHAW, J.**

**{¶1}** Respondent-appellant, Troy Whitaker ("Whitaker"), appeals the January 31, 2011 judgment of the Common Pleas Court of Putnam County, Ohio, granting the request of the petitioner-appellee, Charles Warnecke ("Warnecke"), for a stalking civil protection order ("CPO").

**{¶2}** The facts relevant to this appeal are as follows. On December 11, 2010, the musical, *Annie*, was being performed at the Fort Findlay Playhouse in Findlay, Ohio. Warnecke's daughter, Claire, played the part of Annie, and Warnecke played a few minor roles in the production. That evening, Warnecke's ex-wife, Jennifer, transported Clair to the show and took her downstairs to an area known as the "green room", where other members of the cast were gathered, including Warnecke. Warnecke began speaking with Jennifer about whether he could take their daughters with him to celebrate Christmas with his family the following day. The two could not reach an agreement, and the discussion became heated. Jennifer began yelling at Warnecke, and the director of the musical, Martin Williams, came to intervene. Jennifer went upstairs, and a few minutes later, Jennifer's fiancé,[1] Whitaker, came downstairs to the green room, accompanied by another man, Scott Gross.

---

[1] Jennifer and Whitaker were wed twelve days later.

{¶3} According to Warnecke, Whitaker told him to leave the girls alone, that the girls did not want to be with him, and that he was not to come to the home that Whitaker shared with Jennifer and the girls the next day because that would be trespassing. At this point, Gross stepped within a few inches of Warnecke's face and said, "I do things differently than people around here, do you understand what I'm saying." (Hrg., 1/31/11, p. 30.) When Warnecke addressed Gross by name, he stepped back and asked Warnecke, "why don't we just go outside and settle this[?]" (id. at p. 31.) In response, Warnecke requested that Martin ask the two men to leave. Once again, Gross stated, "Let's go outside and settle this." (id.) Martin informed the men that they needed to stop because they were upsetting all of the people in the room, and Whitaker and Gross went upstairs to watch the musical.

{¶4} The musical consisted of two acts with an intermission in between the acts. After intermission, two actors approached Martin and told him that one of the men had re-entered the playhouse during intermission carrying a gun. Martin informed Warnecke of this, and Warnecke told him that he thought that Whitaker had a concealed carry permit. According to Martin, a number of members of the Fort Findlay Playhouse Board, who were backstage, began questioning whether they should call the police. None of them knew how to proceed because none of them had ever experienced this type of situation and the playhouse did not have a

posted sign prohibiting anyone from entering the premises with a gun. Although Martin asked Warnecke if he wanted to leave, Warnecke elected not to leave.

{¶5} No one from the playhouse approached Whitaker or Jennifer about the gun or called the police to address the situation. Rather, they decided to finish the show and then get everyone separated and out the doors as quickly as possible, particularly Warnecke. In addition, various members of the production decided to monitor different areas of the building, including Martin who monitored the stage area. Throughout the second act whenever someone from the cast left the stage, they would provide an update to the others of what Whitaker, who was seated in the balcony, was doing.

{¶6} At the end of the musical, Whitaker stood up and applauded the performance. When he stood, his gun, which was tucked into his waistband, was visible. Whitaker and Jennifer left the balcony area and waited in the back of the theater for Clair. A cast member informed Jennifer that Whitaker's gun was visible and she moved his shirt to cover the gun.

{¶7} Another member of the cast, Patrick Davis, saw Whitaker's gun when Whitaker was still in the balcony area, and Davis quickly escorted Warnecke to a different area of the playhouse. He then walked Warnecke to his vehicle. According to Warnecke, he never actually saw the gun and did not have any idea of the level of activity that the other members of the production were engaged in

until the following day. However, he did realize that something was wrong when Davis walked him to his vehicle. Warnecke had no further contact with Whitaker.

{¶8} On December 16, 2010, Warnecke filed a petition for a stalking CPO for himself and his daughters against Whitaker.[2] A temporary CPO was granted that same day, and a full hearing on the matter was set for a later date.[3]

{¶9} At the full hearing, Warnecke, Martin Williams, and Patrick Davis testified on Warnecke's behalf about the events at the playhouse. Whitaker and Jennifer testified on Whitaker's behalf. Both Whitaker and Jennifer testified that Whitaker had a permit to carry a concealed weapon and that he carried his gun into the playhouse that night. However, they further testified that he had the gun the entire time that he was there and that although he went to his vehicle during intermission, he did so in order to retrieve an umbrella so that Clair did not have to walk in the rain, not in order to get his gun.

{¶10} After hearing the evidence, the trial court granted Warnecke's request for a CPO for himself but did not extend the CPO to Warnecke's daughters. This CPO provides, inter alia, that Whitaker shall not be within 500 feet of Warnecke or have any contact with him. In addition, Whitaker is not

---

[2] Although the allegations that formed the basis of Warnecke's petition occurred in Findlay, which is located in Hancock County, both Warnecke and Whitaker reside in Putnam County. Thus, Warnecke filed the petition in Putnam County.

[3] The full hearing was initially scheduled for December 27, 2010, but was later rescheduled to January 31, 2011, for reasons not evident in the record.

permitted to possess, use, carry, or obtain any deadly weapon. The trial court made the terms of the CPO effective for five years. This appeal followed, and Whitaker now asserts one assignment of error for our review.

**ASSIGNMENT OF ERROR**

**THE TRIAL COURT ABUSED ITS DISCRETION IN ISSUING THE CIVIL STALKING PROTECTION ORDER AS THERE WAS NO EVIDENCE THAT THE RESPONDENT ENGAGED IN A PATTERN OF CONDUCT CAUSING THE PETITIONER TO BELIEVE RESPONDENT WOULD CAUSE HIM PHYSICAL HARM OR MENTAL DISTRESS AS REQUIRED BY STATUTE.**

{¶11} In his sole assignment of error, Whitaker contends that there was no evidence that he (1) knowingly caused Warnecke to believe that he would cause him physical harm or mental distress and (2) that there was no evidence that he engaged in any such pattern of conduct.

{¶12} When reviewing a trial court's decision to grant a civil protection order, we will not reverse such a decision absent an abuse of discretion. *Kramer v. Kramer*, 3rd Dist. No. 13-02-03, 2002-Ohio-4383. Abuse of discretion "connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary or unconscionable." *Blakemore v. Blakemore* (1983), 5 Ohio St.3d 217, 219, 450 N.E.2d 1140. Further, if there is some competent, credible evidence to support the trial court's decision regarding a CPO petition, there is no abuse of discretion. *Ross v. Ross* (1980), 64 Ohio St.2d 203, 414

N.E.2d 426; see also, *C.E. Morris Co. v. Foley Const. Co.* (1978), 54 Ohio St.2d 279, 280, 376 N.E.2d 578.

{¶13} Revised Code section 2903.214 governs the issuance of a stalking CPO. This section provides that a person may seek civil relief against an alleged stalker by filing a petition containing "[a]n allegation that the respondent engaged in a violation of section 2903.211 of the Revised Code against the person to be protected by the protection order * * *, including a description of the nature and extent of the violation." R.C. 2903.214(C)(1). Thus, in order to obtain a stalking CPO, Warnecke had to establish by a preponderance of the evidence that Whitaker engaged in a violation of R.C. 2903.211, the menacing by stalking statute, against him. *Kramer*, supra, at ¶ 14.

{¶14} Revised Code section 2903.211(A)(1), Ohio's menacing by stalking statute, provides that "[n]o person by engaging in a pattern of conduct shall knowingly cause another to believe that the offender will cause physical harm to the other person or cause mental distress to the other person." Whitaker first contends that there was no evidence that Warnecke suffered mental distress or physical harm as a result of his actions. However, by its very language, the statute does not require a showing that Warnecke actually suffered from mental distress or physical harm. See R.C. 2903.211(A)(1); *Dayton v. Davis* (1999), 136 Ohio App.3d 26, 32, 735 N.E.2d 939. Instead, Warnecke merely had to show that

Whitaker knowingly caused him to *believe he would cause* Warnecke mental distress *or* physical harm.

{¶15} Warnecke testified that he was scared by the actions of Whitaker and Gross in the green room because he did not know what they were going to do. He further testified to the following:

> **It was about intermission, Marty [the director] had came up and just said hey, you know, the guys [Whitaker and Gross] came back in and it looked like they appeared to have something, and I said what are you talking about, and he said, well, it looked like they had something in their coat, and I said are you insinuating a gun, yeah, and I said well, he says one of the guys. At that time Marty didn't know which one it was, I said well it's got to be Troy, he has concealed weapons.**

(id. at pp. 31-32.) After hearing this information, Warnecke was "[r]eally scared." (id. at p. 32.) Warnecke further testified that when Davis escorted him to his vehicle, he knew something was wrong and was scared for himself, his daughter, and other children in the play. When asked if he was still scared at the time of the hearing, Warnecke stated that he felt like his life was in jeopardy and that he was worried for his children when they were in Whitaker's home.

{¶16} Martin also testified that he was scared for Warnecke during the confrontation in the green room and for what might happen in the theater because of the size of Whitaker and Gross and "because they looked really mad[.]" (Hrg., 1/31/11, p. 8.) Further, Martin and Davis testified that when members of the cast

noticed that Whitaker was carrying a gun, they were so concerned for the safety of those in the playhouse, particularly Warnecke, that they began monitoring Whitaker's actions, set up "surveillance" in different areas of the playhouse, contemplated whether calling the police was an appropriate action, and made sure to quickly escort Warnecke out of the theater and to his vehicle. In addition, Davis testified that during the second act of the musical, Warnecke seemed "concerned, worried, afraid what's going to happen, not quite sure[.]" (id. at p. 24.)

{¶17} The evidence before the trial court, including Whitaker's own testimony, established that Whitaker had a gun on his person at least during the second act of the musical. In light of this evidence, as well as the earlier confrontation in the green room between the men, the testimony that Warnecke was told that Whitaker had a gun on him, and Warnecke's testimony that he was really scared when he learned that Whitaker had a gun inside of the playhouse, which was corroborated by Davis' testimony regarding Warnecke's demeanor, we find that there was competent, credible evidence that Whitaker's actions caused Warnecke to believe Whitaker would cause him physical harm. Thus, we find Whitaker's position in this regard to be without merit.

{¶18} The remaining question is whether there was competent, credible evidence that Whitaker caused Warnecke to believe that he would cause Warnecke

physical harm by engaging in a "pattern of conduct." Although the trial court concluded that Whitaker engaged in a pattern of conduct, it did not describe the specific actions of Whitaker that constituted a pattern of conduct.

{¶19} A pattern of conduct is defined as "two or more actions or incidents closely related in time, whether or not there has been a prior conviction based on any of those actions or incidents." R.C. 2903.211(D)(1). Thus, one incident is not sufficient to establish a "pattern of conduct." *Kramer*, supra, at ¶ 15, citing *State v. Scruggs* (2000), 136 Ohio App.3d 631, 737 N.E.2d 574. However, R.C. 2903.211 does not require that the incidents constituting a pattern of conduct occur on at least two different days. Rather, "a pattern of conduct could arise out of two or more events occurring on the same date, provided that there was a sufficient interval between them." *State v. Scruggs*, 136 Ohio App.3d at 634, 737 N.E.2d 574.

{¶20} Warnecke maintains that the evidence demonstrates that two specific incidents occurred. According to Warnecke, the first occurred in the green room when Whitaker told him not to come to his home the following day and the second occurred when Whitaker left the building during intermission and retrieved his gun, which he exposed to potentially everyone in the theater, including Warnecke.

{¶21} As to the first incident, the testimony revealed that Whitaker told Warnecke not to come to his home the following day because that would be

trespassing. This did not constitute a threat to cause physical harm or mental distress. However, both Warnecke and Martin heard Gross tell Warnecke that they should take this outside, implying a fight would transpire between the men once they were outside of the building, and that he said this type of thing more than once.[4] While Whitaker testified that he did not hear what Gross said to Warnecke when they were in the green room, the record is devoid of any evidence that Whitaker attempted to stop Gross from threatening Warnecke or somehow acted as if he did not endorse Gross' actions. In addition, the trial court was free to disbelieve Whitaker's testimony that he did not hear these multiple threats and to conclude that Whitaker acted in complicity with Gross, particularly in light of the close proximity of all involved. Therefore, there was some competent, credible evidence that the first threatening incident occurred, causing Warnecke to believe that these men would cause him physical harm.

---

[4] In Warnecke's brief to this Court, he asserts that Martin testified that in the green room "he observed Whitaker [*sic*] and Scott Gross threatening Warnecke to stay away or there would be trouble[,]" and "that Warnecke would be 'taken out.'" Thus, he asserts that "[a]ny rational human being just being told that he will be 'taken' out would cause an individual to believe physical harm is likely." However, this is somewhat of a misstatement of the record. Martin actually testified that "they basically told Chuck that he better stay away from the girls, they didn't want to be around him, and if he didn't, *the inference I got* was that there would be further trouble." (Hrg., 1/31/11, p. 6.) (Emphasis added.) He further testified that "[t]hen the other fellow [Gross] kept saying you don't know me, I'll take you out, you know, *that kind of stuff*." (id.) (Emphasis added.) When asked during cross-examination what he specifically heard during this confrontation, Martin stated, "[t]he things that stick with me are you better stay away from the girls, they don't want to be with you, and don't come to my house tomorrow or else." (id. at p. 15.) However, during cross-examination, Warnecke was specifically asked if Whitaker threatened him while they were in the green room, and his response was that Whitaker "told me not to come to his house because that's trespassing." He also failed to testify that Gross told him that he would "take him out." Rather, he testified that Gross repeatedly told him that they should step outside and settle this.

-11-

{¶22} As for the second incident, Whitaker and Jennifer both testified that he never left the building to get his gun. To the contrary, they testified that he had his gun on him the entire time he was at the playhouse. When asked why he went to his vehicle, they explained that he went to his vehicle to get an umbrella so that Clair would not have to walk in the rain. They also testified that he untucked his gun, which had been in his waistband under his shirt, before the second act began by placing his shirt between his skin and the gun because he was uncomfortable during the first act. In addition, when an actor in the play informed Jennifer after the play was over that Whitaker's gun was visible, she moved his shirt to conceal it.

{¶23} Warnecke, Martin, and Davis did not testify that they witnessed Whitaker go to his vehicle or that they saw him retrieve his gun from the vehicle. Rather, Martin testified that he was told by two actors in the play that one of the men involved in the earlier confrontation had left the building during intermission and came back inside with a gun. However, Martin testified that after the musical he actually saw Whitaker with the gun. More specifically, he testified that "Troy [Whitaker] was standing up in the back area, and basically with his hands on his hips, and you could see a weapon in his pants." (id. at p. 11.)

{¶24} Davis testified that he played the part of "Daddy Warbucks" in the musical and was able to observe Whitaker sitting in the balcony during the first

act. During this time, he noticed that Whitaker appeared to be watching some sort of phone or hand-held game. He did not see him with a gun during that first act but he was unable to see Whitaker's waistband at this time. Davis testified that during intermission he was informed by the stage manager that an audience member had gone out to a vehicle and came back in with a handgun tucked in his pants. Davis did not see the gun, himself, until Whitaker stood at the end of the musical to applaud. Davis testified that Whitaker made no attempt to conceal the gun, that it looked like Whitaker was trying to show off the gun, and that although he never saw any indication that Whitaker was using the weapon towards Warnecke, he "took it as an intimidation against the entire [p]layhouse." (Hrg., 1/31/11, p. 26.)

{¶25} Whitaker admitted that he left the playhouse during intermission and went to his vehicle. Although he maintains that he retrieved an umbrella, not his gun, the trial court, as the factfinder, was free to disbelieve this purported reason. Furthermore, Warnecke and Martin testified that they did not see Whitaker with a gun during the confrontation in the green room, but a number of people told them that they saw Whitaker with a gun following intermission. While this testimony may have been admissible to explain the subsequent actions of Warnecke, Martin, and Davis, it was hearsay and could not be offered or considered for the truth of

the matter asserted, i.e. that Whitaker engaged in the deliberate action of retrieving his gun from his vehicle during intermission. See Evid.R. 801(C); Evid.R. 802.

{¶26} Nevertheless, considering no one, other than Whitaker and Jennifer, both of whom had a reason to testify untruthfully, saw this gun until after Whitaker went to his vehicle during intermission, the trial court could reasonably conclude that Whitaker went to his vehicle to get his gun and placed it on his person in a manner that everyone on the stage, including Warnecke, could see that he had a gun.

{¶27} Given this evidence, we find that there was some competent, credible basis upon which the trial court could have reasonably concluded that Whitaker committed a separate and distinct second act to cause Warnecke to believe he would cause him physical harm by displaying the gun in a manner that caused a number of people to become so concerned for Warnecke's safety that they considered contacting the police, continually monitored Whitaker during the second act, and decided upon a safety plan to get Warnecke out of the building and unharmed as quickly as possible. This action, coupled with the earlier confrontation in the green room, provided sufficient evidence for the trial court to conclude that this constituted a knowing pattern of conduct by Whitaker to cause Warnecke to believe that he would cause Warnecke physical harm, and the trial court did not abuse its discretion in granting the CPO.

{¶28} For all of these reasons, the assignment of error is overruled and the judgment of the Common Pleas Court of Putnam County, Ohio, is affirmed.

*Judgment Affirmed*

**PRESTON and WILLAMOWSKI, J.J., concur.**

**/jlr**