[Cite as *Mullen v. Hobbs*, 2012-Ohio-6098.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO


| | | |
|---|---|---|
| KELLY MULLEN, | : | APPEAL NO. C-120362 |
| | | TRIAL NO. SK-1101029 |
| Petitioner-Appellee, | : | |
| vs. | : | |
| MICHELE HOBBS, | : | *O P I N I O N.* |
| Respondent-Appellant. | : | |


Civil Appeal From: Hamilton County Common Pleas Court

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: December 26, 2012


*Cornetet, Meyer, Rush & Kirzner Co., LPA*, and *Karen P. Meyer*, for Petitioner-Appellee,

*Cohen, Todd, Kite & Stanford, LLC*, and *John L. O'Shea*, for Respondent-Appellant.


Please note:  This case has been removed from the accelerated calendar.

**FISCHER, Judge.**

{¶1}   Respondent-appellant Michele Hobbs appeals from the judgment of the Hamilton County Court of Common Pleas entering a five-year order of protection against her in favor of petitioner-appellee Kelly Mullen and Mullen's daughter. Because we determine that the record contains competent, credible evidence to support the trial court's determination that Hobbs, by engaging in a pattern of conduct, had knowingly caused Mullen and her daughter to believe that they would suffer mental distress, we affirm the issuance of the protection order.

{¶2}   Mullen filed a petition for a civil stalking protection order against Hobbs on behalf of herself and her child on September 8, 2011. In the petition, Mullen alleged that Hobbs had insisted that she had legal rights to Mullen's daughter and that Hobbs had appeared unannounced on her child's first day of school in mid-August 2011. Hobbs had then visited the school, again unannounced, in early September. The same day that the petition was filed, the trial court entered an ex parte temporary protection order until the matter could be set for an evidentiary hearing.

{¶3}   At the hearing on Mullen's petition, Mullen filed as an exhibit the Ohio Supreme Court's opinion in *Hobbs v. Mullen*, 129 Ohio St.3d 417, 2011-Ohio-3361, 953 N.E.2d 302. In that opinion, the Supreme Court detailed the relationship between Hobbs and Mullen: The couple had begun dating in 2000, and in 2003, they had decided to ask Hobbs's friend, Scott Liming, to donate his sperm so that Mullen could undergo in vitro fertilization. Liming had agreed. Hobbs and Mullen both had contributed financially to the fertilization process, and, in 2005, Mullen had given birth to a girl. For two years, Hobbs and Mullen had jointly raised the

child; however, in 2007, Mullen and the child had moved out of the house that they had shared with Hobbs, giving rise to a legal dispute between Hobbs and Mullen over the child. On July 12, 2011, the Ohio Supreme Court had affirmed the juvenile court's determination that Hobbs had been a non-parent to the child and that Mullen had not relinquished any of her custodial rights to Hobbs. *Id.* at ¶ 23.

{¶4} Mullen testified at the hearing that she had had several "heated conversations" with Hobbs regarding the outcome of their litigation. Hobbs had told Mullen that Mullen could not control when Hobbs saw the child and that Hobbs would make sure that the child knows Hobbs as a mother, too, and that the child will hate Mullen. Mullen testified that she had clearly explained to Hobbs that she did not want Hobbs to see or speak to her daughter. Nevertheless, Mullen testified that on the child's first day of school, August 16, 2011, she and Liming had taken the child to school and had been standing inside the front doors when Mullen had witnessed Hobbs "pacing" outside the school. Hobbs then had waved at the child, and, at that point, Mullen had motioned for Hobbs to come inside. Hobbs had taken a quick picture of the child, and then she had left. Mullen testified that she had felt Hobbs's actions had "wrecked the mood for a minute," and that she could tell that the experience had caused her daughter anxiety. Mullen testified that "[i]t was all very weird." Hobbs admitted in her testimony that she had shown up at the school that morning to see the child.

{¶5} Mullen testified that she had been bothered by Hobbs's actions, so she had met with the child's principal and teacher to inform them of the prior custody dispute and had told them that she did not want Hobbs to have contact with her daughter. Mullen then had sent the following email to Hobbs:

Michele,

Your unannounced and unplanned visit at [my child's] school was out of line this morning.

Unscheduled visits AND contact with [my child] is (sic) not approved by me.

Please refrain from further contact or I will be forced to seek further legal recourse.

To be clear, unannounced visits to [my child's] homes, schools, activities and the like are not approved by me and are in violation of my wishes for my daughter.

{¶6}   Hobbs had replied to Mullen's email as follows:

You've got to be kidding.  For once you acted in [the child's] best interest, now this?  There was nothing out of line getting to wish my daughter good luck on her first day of school.  [The child's school] is a public school in my neighborhood.  I don't need approval to visit [the school].  And last I looked, your house * * * isn't even in the district, so unless you are paying the $6566.18 for out of district tuition, I have more of a right to be there than you.  Liming's house on Beechwood is in the district, but [the child] does not live there and he still has no legal custodial rights granted by the courts, so his rights and mine are the same here.  Unless of course you have lied and put Liming's address down as [the child's] residence, then that changes everything.  And to be clear, there is no such thing as a 'violation' of your wishes.  You will not allow [the child] to see me.  If there is anyone violating

4

someone here it's you. I really thought you had made an effort and turned a corner this morning. Stupid me. Poor [child]...still.

{¶7} After this exchange, Mullen testified that the child's teacher had told Mullen that Hobbs had visited the school playground on September 6, and that Hobbs had talked to other children through the fence. A teacher's assistant at the child's school confirmed Mullen's testimony and stated that, at the beginning of the school year in September, she had seen Hobbs standing with a dog just outside the fenced-in school playground, and Hobbs had been talking with two children. As a result, the assistant testified that she had brought all the children inside from recess, including Mullen's child.

{¶8} Mullen testified that another incident had occurred on September 7 where her daughter had called her from school, and she had been upset. The child had stated that a classmate had brought beef jerky to school from the child's "other mom," which had caused the child to be embarrassed. Another teacher at the child's school testified that the child had seemed upset in early September and had asked to call her mother. Hobbs admitted in her testimony that she had given beef jerky to another child and had told him to give it to Mullen's daughter. Yet another school employee testified that she had received an email from Hobbs expressing concern about the child.

{¶9} Mullen also testified that Hobbs had told her that Hobbs had been arrested for aggravated menacing involving a firearm and had applied for a concealed carry permit. Because of Hobbs's demonstrated "hatred," Mullen testified that she was afraid that Hobbs would take the child, or that Hobbs would harm Mullen or the child.

{**¶10**}  Based upon the evidence presented, the magistrate found that Mullen proved, by a preponderance of the evidence, that Mullen and her daughter were entitled to a five-year civil stalking protection order against Hobbs.  The trial court approved and adopted the magistrate's findings.  Hobbs filed objections to the order, which were overruled by the trial court.  This appeal ensued.

### *Civil Stalking Protection Order*

{**¶11**}  R.C. 2903.214 provides a framework for obtaining a civil stalking protection order ("CSPO").  To obtain a CSPO, a petitioner must show, by a preponderance of the evidence, that a respondent's conduct violates the menacing-by-stalking statute, R.C. 2903.211.  *Lindsay v. Jackson*, 1st Dist. No. C-990786, 2000 Ohio App. LEXIS 4043, *13 (Sept. 8, 2000).  R.C. 2903.211(A)(1) provides, "[n]o person by engaging in a pattern of conduct shall knowingly cause another person to believe that the offender will cause physical harm to the other person or cause mental distress to the other person."

{**¶12**}  The decision to grant or deny a CSPO is left to the sound discretion of the trial court, and we will not reverse the trial court's decision absent an abuse of discretion.  *Jenkins v. Jenkins*, 10th Dist. No. 06AP-652, 2007-Ohio-422, ¶ 10.  An abuse of discretion occurs when the court's attitude is unreasonable, arbitrary or unconscionable.  *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).  Moreover, this court will not reverse a trial court's decision on manifest-weight-of-the-evidence grounds unless, after reviewing all evidence and reasonable inferences and considering the credibility of the witnesses, we determine that the trier of fact lost its way and created such a manifest miscarriage of justice that we must reverse its decision.  *Ensley v. Glover*, 6th Dist. No. L-11-1026, 2012-Ohio-

4487, ¶ 9; *see also Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 14-23, citing *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997).

### *Mental Distress*

{¶13} In Hobbs's first assignment of error, she argues that the trial court's decision issuing a CSPO against her was not supported by competent, credible evidence because insufficient evidence was offered to support the conclusion that Hobbs had knowingly caused mental distress to Mullen and her daughter. This court recently held that mental distress need not actually have been caused in order for a CSPO to issue, and that a petitioner need only show that an offender, by engaging in a pattern of conduct, knowingly caused the petitioner to believe that she or he would suffer mental distress or physical harm. *See Griga v. DiBenedetto*, 1st Dist. No. C-120300, 2012-Ohio-_____, ¶ __. Thus, in addressing Hobbs's assignment of error, we must determine whether Mullen showed, by a preponderance of the evidence, that Hobbs, by engaging in a pattern of conduct, had knowingly caused Mullen and Mullen's daughter to believe that they would suffer mental distress.

{¶14} R.C. 2903.211(D)(2) defines "mental distress" as:

(a) Any mental illness or condition that involves some temporary substantial incapacity; (b) Any mental illness or condition that would normally require psychiatric treatment, psychological treatment, or other mental health services, whether or not any person requested or received psychiatric treatment, psychological treatment, or other mental health services.

7

{¶15} A petitioner is not required to present expert testimony regarding mental distress, and the trier of fact may invoke its own experience in determining this element. *See, e.g., State v. Horsley*, 10th Dist. No. 05AP-350, 2006-Ohio-1208, ¶ 46. "[M]ere mental stress or annoyance" is insufficient to establish mental distress. *Caban v. Ransome*, 7th Dist. No. 08 MA 36, 2009-Ohio-1034, ¶ 28. A petitioner's statement that respondent caused mental distress, without more, is also insufficient. *Lindsay*, 1st Dist. No. C-990786, 2000 Ohio App. LEXIS 4043, at *3.

{¶16} As to prong (a) of R.C. 2903.211(D)(2)—temporary substantial incapacity—"[i]ncapacity is substantial if it has a significant impact upon the [petitioner's] daily life." *State v. Willett*, 9th Dist. No. 25521, 2012-Ohio-1027, ¶ 10, quoting *State v. Payne*, 178 Ohio App.3d 617, 2008-Ohio-5447, 899 N.E.2d 1011, ¶ 9. Substantial incapacity does not mean that the petitioner must have been incapacitated to the point of hospitalization or to the point of becoming incapable of caring for himself or herself. *Payne* at ¶ 9. In *Payne*, the court determined that mental distress had been proven beyond a reasonable doubt by the state in a menacing-by-stalking prosecution where the victim had been so afraid that she had been unable to leave her house for approximately six hours, and that qualified as substantial incapacity. *Id.*

{¶17} Evidence of a petitioner's fear is also relevant to a determination of mental distress under prong (b) of R.C. 2903.211(D)(2)—any mental illness or condition that would normally require treatment. *See Smith v. Wunsch*, 162 Ohio App.3d 21, 2005-Ohio-3498, 832 N.E.2d 757, ¶ 19. In *Wunsch*, the petitioner sought a CSPO against the respondent, a former co-worker, after the respondent: had shown up at the petitioner's new place of employment, hiding in the bushes on one

occasion; had driven past the petitioner while the petitioner had been going to and from work in the same day, even though the petitioner had lived a considerable distance from the respondent; had sent the petitioner emails; and had called the petitioner. *Id.* at ¶ 4.

{¶18} The petitioner in *Wunsch* testified that she had feared for her safety because of the respondent's actions. The petitioner's friend testified that she had been on the phone with the petitioner during one of the incidents with the respondent, and that the petitioner had been "hysterical." The police officer who had made a police report following one of these incidents testified that the petitioner had been "pretty shook up" and "upset." The Fourth Appellate District affirmed the trial court's determination that this evidence established mental distress under prong (b). *Id.* at ¶ 19.

{¶19} Hobbs argues that, at most, Mullen's testimony showed that Hobbs's actions had bothered Mullen, had embarrassed her, and had made her uncomfortable. Contrary to Hobbs's assertion, we determine that the testimony at the hearing provided competent, credible evidence from which the trial court could have determined that Hobbs had caused Mullen and her daughter to believe that they would suffer mental distress.

{¶20} Mullen testified that she had had several "heated conversations" with Hobbs regarding custody of the child, and that even after the Supreme Court had determined that Mullen was the sole legal custodian and residential parent of the child in July 2011, Hobbs had maintained that she was the child's mother and that Mullen could not control when Hobbs saw the child. Mullen also testified that Hobbs had stated that Hobbs would make sure that the child hates Mullen.

Moreover, Mullen testified that Hobbs had demonstrated hatred toward her, and that Mullen had been afraid that Hobbs would take her daughter, or that Hobbs would harm Mullen or her daughter.

{¶21} After the incident where Hobbs had appeared uninvited on the first day of school, Mullen testified that she had met with her daughter's principal and teacher, informing them of the background between her and Hobbs and letting them know that she did not want Hobbs to have contact with her daughter. Mullen also had made her feelings clear to Hobbs in an email. Mullen's daughter also had become anxious in the presence of Hobbs. Mullen's and her daughter's reactions to Hobbs's conduct evidences that they had been upset by Hobbs's behavior.

{¶22} Even after Hobbs had been warned by Mullen, Hobbs had contacted Mullen's daughter twice more within the next couple of weeks. A teacher's assistant testified that she had seen Hobbs standing with a dog just outside the playground, talking with two children, and that this had caused the assistant to bring all the children, including Mullen's child, inside the school from recess prematurely. Moreover, according to Mullen, the "beef jerky" incident where Hobbs had sent beef jerky to school with another young child to give to Mullen's daughter had caused Mullen's daughter to be upset.

{¶23} We determine that the escalation of Hobbs's conduct toward Mullen and her daughter caused them to believe that they would suffer mental distress, especially in light of the years of litigation between Mullen and Hobbs. Therefore, the totality of the evidence presented to the trial court provides competent, credible evidence for the conclusion that Hobbs had caused Mullen and her daughter to believe that they would suffer mental distress.

### *Hobbs Acted Knowingly*

**{¶24}** We also determine that the evidence presented at the hearing provided competent, credible evidence from which the trial court could have determined that Hobbs had acted knowingly. R.C. 2901.22(B) provides that

[a] person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when he is aware that such circumstances probably exist.

**{¶25}** Mullen testified that she had made it clear to Hobbs that she did not want Hobbs to see or speak to her daughter; nevertheless, Hobbs had waited outside of the child's school, unannounced. After that incident, Mullen had sent Hobbs an email stating that she did not want Hobbs to have any contact with her child. Hobbs had indicated in her reply email to Mullen that Hobbs had no intention of abiding by Mullen's wishes stating, "I don't need approval to visit [the school]," and referring to the child as Hobbs's daughter. Hobbs then had defied Mullen's wishes by contacting the child at school, once directly at the playground, and another time indirectly through another child at the school.

**{¶26}** Competent, credible evidence exists in the record from which the trial court could have determined that Hobbs had acted knowingly for purposes of R.C. 2903.211. Therefore, we overrule Hobbs's first assignment of error.

### *Physical Harm*

**{¶27}** In her second assignment of error, Hobbs argues that the trial court's judgment issuing a CSPO against her was not supported by competent, credible evidence that Hobbs had knowingly caused Mullen and her daughter to believe that

11

they would suffer physical harm. A petitioner seeking a CSPO under the menacing-by-stalking statute, however, need only satisfy the mental-distress prong or the physical-harm prong, not both. R.C. 2903.211(A)(1); *see also Lindsay*, 1st Dist. No. C-990786, 2000 Ohio App. LEXIS 4043, at *14 (stating that the physical harm and mental distress prongs in the menacing-by-stalking statute are independent).

{¶28} Because we determine that the trial court's decision was supported by competent, credible evidence as to Mullen's and her daughter's belief of mental distress, the trial court's decision can be upheld on this basis alone. We need not reach whether Mullen proved, by a preponderance of the evidence, that she had believed that Hobbs would cause physical harm to her or her daughter. As a result, we decline to address Hobbs's second assignment of error.

{¶29} In conclusion, we determine that competent, credible evidence exists to support the trial court's finding that Hobbs, by engaging in a pattern of conduct, had knowingly caused Mullen and her daughter to believe that they would suffer mental distress. Further, we determine that the trial court did not abuse its discretion in ordering a five-year CSPO against Hobbs in favor of Mullen and her daughter. Therefore, the judgment of the trial court is affirmed.

Judgment affirmed.

**SUNDERMANN, P.J.,** concurs.
**CUNNINGHAM, J.,** concurs in judgment only.

**CUNNINGHAM, J.,** concurring in judgment only.

{¶30} I agree with the majority in holding that the decision of the trial court must be affirmed; however, I believe that the standard set forth in *Griga v.*

12

*DiBenedetto*, 1st Dist. No. C-120300, 2012-Ohio-_____, and applied by the majority in this case, is incorrect.

{¶31} This court in *Griga* followed the majority of other appellate districts in holding that mental distress need not actually have been suffered under R.C. 2903.211. *See Fortney v. Willhoite*, 11th Dist. No. 2011-L-120, 2012-Ohio-3024, ¶ 41; *State v. Hart*, 12th Dist. No. CA2008-06-079, 2009-Ohio-997, ¶ 31; *Bloom v. Macbeth*, 5th Dist. No. 2007-COA-050, 2008-Ohio-4564, ¶ 11; *Horsley*, 10th Dist. No. 05AP-350, 2006-Ohio-1208, at ¶ 47; *City of Dayton v. Davis*, 136 Ohio App.3d 26, 32, 735 N.E.2d 939 (2d Dist.1999); *Ensley v. Glover*, 6th Dist. No. L-11-1026, 2012-Ohio-4487, ¶ 13; *Retterer v. Little*, 3d Dist. No. 9-11-23, 2012-Ohio-131, ¶ 39.

{¶32} Of the other appellate districts that have held that actual mental distress is not required under the menacing-by-stalking statute, at least one district has explained that the plain language of the statute dictates such an outcome, without any further analysis. *See Retterer* at ¶ 39; *see also Warnecke v. Whitaker*, 3d Dist No. 12-11-03, 2011-Ohio-5442, ¶ 14.

{¶33} The *Griga* court did not reach its conclusion under a plain-language analysis, but instead, the court examined the legislative intent of the statute. According to the court, the intent of the statute is to allow a court to intervene before harm occurs—both physical and mental harm; therefore, a petitioner or victim need only show that he or she believes that mental distress will occur. *Griga*, 1st Dist. No. C-120300, 2012-Ohio-_____, at ¶ ___.

{¶34} I agree that CSPOs serve as a critical tool for preventing harm, I believe, however, that the court need not resort to legislative intent in interpreting the mental-distress prong of the menacing-by-stalking statute because the statute is

13

not ambiguous, especially when read in context with the definition of mental distress under the statute.

{¶35} Using a plain-language analysis, the Seventh Appellate District held that the menacing-by-stalking statute requires proof of actual mental distress. *Caban*, 7th Dist. No. 08 MA 36, 2009-Ohio-1034, at ¶ 23. In reaching this conclusion, the *Caban* court determined that, "by repeating 'to the other person' after both physical harm and mental distress, rather than merely placing it at the end of the sentence, the legislature expressed that 'to believe' does not modify 'mental distress'." *Id.* at ¶ 24.

{¶36} I agree with the determination of the court in *Caban* for the reason set forth by that court, but also because of the legislature's definition of mental distress under the statute. R.C. 2903.211(D)(2) defines mental distress for purposes of menacing by stalking, in part, as "[a]ny mental illness or condition that would normally require psychiatric treatment, psychological treatment, or other mental health services, whether or not any person requested or received psychiatric treatment, psychological treatment, or other mental health services." R.C. 2903.211(D)(2)(b).

{¶37} By using the phrase "normally require * * * treatment" in defining mental distress, the legislature created an objective inquiry. This objective test for mental distress is incompatible with an interpretation of the menacing-by-stalking statute requiring only that the victim or petitioner believe that mental distress will be caused—a subjective inquiry. *But see Lane v. Brewster*, 12th Dist. No. CA2011-08-060, 2012-Ohio-1290, ¶ 21 (determining that the mental-distress inquiry must focus on the petitioner, and not that of a reasonable person).

14

{¶38} Moreover, a subjective belief inquiry for mental distress, requiring only that a petitioner or victim believe that he or she will suffer mental distress, would render as superfluous the phrase "whether or not any person requested or received * * * treatment, or other mental health services[]" in the legislature's definition of mental distress under R.C. 2903.211(D)(2)(b). *See State ex rel. Carna v. Teays Valley Local School Dist. Bd. of Edn.*, 131 Ohio St.3d 478, 2012-Ohio-1484, 967 N.E.2d 193, ¶ 18-19 (when interpreting statutes, courts must give significance to every word in the statute and should not treat any part of a statute as superfluous unless "manifestly required").

{¶39} I would conclude that the menacing-by-stalking statute requires proof of mental distress or belief of physical harm. Applying an actual-mental-distress standard, I would hold that Mullen proved by a preponderance of the evidence that Hobbs, by engaging in a pattern of conduct, had knowingly caused Mullen and her daughter mental distress. Therefore, I join in the majority's judgment affirming the trial court's issuance of a CSPO.

Please note:
   The court has recorded its own entry on the date of the release of this opinion.