[Cite as *Wilson v. Lyon*, 2016-Ohio-7734.]

## IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## MARION COUNTY

MARY ANN LYON,

     PETITIONER-APPELLEE,               CASE NO. 9-16-17

     v.

DEBORAH WILSON,                   O P I N I O N

     RESPONDENT-APPELLANT.

Appeal from Marion County Common Pleas Court
Trial Court No. 16-CV-0099

Judgment Affirmed in Part, Reversed in Part and Cause Remanded

Date of Decision: November 14, 2016

APPEARANCES:

    *Jon L. Jensen* for Appellant

**SHAW, P.J.**

{¶1} Respondent-appellant, Deborah Wilson, appeals the March 29, 2016 judgment of the Marion County Court of Common Pleas, issuing a two-year civil stalking protection order ("CSPO") requiring her to stay 500 feet from petitioner-appellee, Mary Ann Lyon and her husband, Steven Lyon. On appeal, Wilson challenges the sufficiency and the manifest weight of the evidence to support the granting of the CSPO, as well as the scope of the order.

### *Feuding Neighbors*

{¶2} The Wilsons and the Lyons have been neighbors along a rural road in Caledonia, Ohio, for eighteen years. Their homes are situated approximately a quarter-mile apart and the Wilsons farm much of the land bordering the Lyons' property. The families were initially friendly for many years, however, in recent times, and for reasons not clear in the record, the relationship devolved into a bitter feud, resulting in the Lyons filing numerous reports with law enforcement complaining of Deborah and her teenaged sons' behavior towards them.

{¶3} After an incident in February 2016, Mary Ann filed a petition for a CSPO against Deborah. In her petition, Mary Ann alleged Deborah and members of her family had engaged in a pattern of harassment for over a year, consisting of chasing her in a vehicle and taunting her and her husband by shouting obscenities and threats as they passed by the Lyon family home. Mary Ann claimed almost

every incident of harassment occurred on the Lyons' property and/or in front of their home. In support of her petition, Mary Ann filed copies of police reports that documented Deborah and her family members' behavior towards them, a timeline she compiled demonstrating numerous instances of harassment by the Wilsons over the preceding year, and a statement prepared by witnesses who had also observed some of the Wilsons' conduct toward Mary Ann and Steven. The trial court issued an ex parte temporary CSPO and set a date for a full hearing.

{¶4} Both parties and their husbands were present for the full hearing before the court and provided testimony in support of their respective positions relative to the issuance of the CSPO. After hearing the evidence presented, the trial court specifically found Mary Ann's version of the events more credible than Deborah's and further found that Mary Ann established by a preponderance of the evidence all the necessary elements to satisfy the issuance of a CSPO.

{¶5} The trial court issued a CSPO protecting both Mary Ann and Steven, and requiring Deborah to stay 500 feet from them, not to initiate any contact with them, and not to cause or to encourage any person to do any act prohibited by the CSPO. The trial court also included a provision in the CSPO permitting Deborah to travel on the road in front of the parties' homes, so long as Deborah "neither honks her horn, gestures, or yells at petitioner." (Doc. No. 10 at 4).

**{¶6}** Deborah filed this appeal, asserting the following assignments of error.

## ASSIGNMENT OF ERROR NO. I

**THE JUDGMENT OF THE TRIAL COURT IS NOT SUPPORTED BY COMPETENT CREDIBLE EVIDENCE AS THE PETITIONER-APPELLEE FAILED TO ESTABLISH ELEMENTS FOR A CIVIL STALKING PROTECTION ORDER.**

## ASSIGNMENT OF ERROR NO. II

**THE TRIAL COURT ABUSED ITS DISCRETION IN GRANTING A STALKING CIVIL [SIC] PROTECTION ORDER.**

**{¶7}** Due to their interrelated nature, we elect to address the assignments of error together.

### *Standard of Review*

**{¶8}** In her first and second assignments of error, Deborah challenges the trial court's decision granting Mary Ann's petition for a protection order against her. Generally, when reviewing a trial court's decision to grant a CSPO, we will not reverse the decision absent an abuse of discretion. *Prater v. Mullins*, 3d Dist. Auglaize No. 2-13-04, 2013-Ohio-3981, ¶ 5. An abuse of discretion implies that the court's attitude was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

**{¶9}** Deborah also challenges the sufficiency of the evidence presented by Mary Ann at the evidentiary hearing and claims that the trial court's decision is

-4-

against the manifest weight of the evidence. "Our standard of reviewing the sufficiency of the evidence in a civil case is whether, after viewing the evidence in a light most favorable to the prevailing party, the judgment is supported by competent and credible evidence." *Moran v. Gaskella*, 5th Dist. Knox. No.2011-CA-21, 2012-Ohio-1158, ¶ 12, citing *Technical Construction Specialties v. Cooper*, 8th Dist. Cuyahoga No. 96021, 2011-Ohio-5252.

{¶10} The Ohio Supreme Court has recently clarified and explained the standard of review to be applied when assessing the manifest weight of the evidence in a civil case. *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179. In *Eastley*, the court held that the standard of review for the manifest weight of the evidence established in *State v. Thompkins*, 78 Ohio St.3d 380 (1997), is also applicable in civil cases. *Id*. at ¶ 17–19. Consequently, when reviewing the weight of the evidence, our analysis must determine whether the trial court's judgment was supported by the greater amount of credible evidence, and whether the plaintiff met its burden of persuasion, which in this instance is by a preponderance of the evidence. *Eastley* at ¶ 19.

{¶11} A preponderance of the evidence is defined as "the greater weight of the evidence, that is, evidence that you believe because it outweighs or overbalances in your mind the evidence opposed to it. A preponderance means evidence that is more probable, more persuasive, or of greater probative value. It is the quality of

the evidence that must be weighed." *Cawrse v. Allstate Ins. Co.*, 5th Dist. Ashland No. 09COA002, 2009-Ohio-2843, ¶ 29.

### *Discussion*

**{¶12}** Section 2903.214 of the Revised Code governs the issuance of a CSPO. It states, in relevant part:

> **(C) A person may seek relief under this section for the person, or any parent or adult household member may seek relief under this section on behalf of any other family or household member, by filing a petition with the court. The petition shall contain or state all of the following:**
>
> **(1) An allegation that the respondent is eighteen years of age or older and engaged in a violation of section 2903.211 of the Revised Code against the person to be protected by the protection order * * *, including a description of the nature and extent of the violation.**

Section 2903.211 of the Revised Code, defines menacing by stalking and provides, in part, that:

> **No person by engaging in a pattern of conduct shall knowingly cause another person to believe that the offender will cause physical harm to the other person or a family or household member of the other person or cause mental distress to the other person or a family or household member of the other person.**

**{¶13}** Therefore, to be entitled to a CSPO, the petitioner must establish by a preponderance of the evidence that the respondent (1) engaged in a pattern of conduct (2) that the respondent knew (3) would cause the person to be protected under the CSPO to believe that the respondent would cause the person physical harm

or mental distress. *Retterer v. Little*, 3d Dist. Marion No. 9-11-23, 2012-Ohio-131, ¶ 26.

**{¶14}** The term "pattern of conduct" is defined as "two or more actions or incidents closely related in time, whether or not there has been a prior conviction based on any of those actions or incidents." R.C. 2903.211(D)(1). Even though the phrase "closely related in time" is not defined, appellate districts have concluded that "[i]n failing to delimit the temporal period within which the two or more actions or incidents must occur, the statute leaves that matter to be determined by the trier of fact on a case-by-case basis." *Ellet v. Falk*, 6th Dist. Lucas No. L-09-1313, 2010-Ohio-6219, ¶ 22, citing *State v. Dario*, 106 Ohio App.3d 232, 238 (1st Dist.1995).

**{¶15}** Knowingly is defined in R.C. 2901.22(B), which provides that "[a] person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature. A person has knowledge of circumstances when the person is aware that such circumstances probably exist." "Consequently, a petitioner seeking a CSPO under [Ohio's menacing by stalking statute] is not required to prove purpose or intent to cause physical harm or mental distress." *Echemann v. Echemann*, 3d Dist. Shelby No. 1-15-19, 2016-Ohio-3212, ¶ 36.

**{¶16}** With regard to the last element to be proven in order for a person to be entitled to a CSPO, R.C. 2903.211(A)(1) does not require the petitioner to

demonstrate that he or she actually suffered physical harm. The petitioner merely has to demonstrate that the respondent knowingly caused the petitioner to believe that the respondent would cause him or her physical harm. R.C. 2903.211(A)(1). Further, the statute defines "mental distress" as any of the following (a) "[a]ny mental illness or condition that involves some temporary substantial incapacity;" and (b) "[a]ny mental illness or condition that would normally require psychiatric treatment, psychological treatment, or other mental health services, whether or not any person requested or received psychiatric treatment, psychological treatment, or other mental health services." R.C. 2903.211(D)(2).

{¶17} "[M]ental distress for purposes of menacing by stalking is not mere mental stress or annoyance." *Caban v. Ransome*, 7th Dist. No. 08 MA 36, 2009–Ohio–1034, ¶ 29. While R.C. 2903.211(D)(2) requires evidence that the person to be protected under the CSPO developed a mental condition that involved some temporary substantial incapacity or that would normally require mental health services, the statute does not, however, require proof that the victim sought or received treatment for mental distress. *State v. Szloh*, 189 Ohio App.3d 13, 2010-Ohio-3777, ¶ 27 (2d Dist.). Nor does the statute require that the mental distress be totally or permanently incapacitating or debilitating. *See* Retterer, 2012-Ohio-131, ¶ 41.

**{¶18}** Rather, "[i]ncapacity is substantial if it has a significant impact upon the victim's daily life." *State v. Horsley*, 10th Dist. Franklin No. 05AP–350, 2006–Ohio–1208, ¶ 48. Thus, testimony that the respondent's conduct caused the person to be protected under the CSPO considerable fear and anxiety can support a finding of mental distress under R.C. 2903.211. *See Horsley* at ¶ 47-48; *Middletown v. Jones*, 167 Ohio App.3d 679, 2006–Ohio–3465, at ¶ 8. Additionally, evidence of changed routine can corroborate a finding of mental distress. *Smith v. Wunsch*, 162 Ohio App.3d 21, 2005-Ohio-3498, ¶ 20 (4th Dist.) ¶ 20, citing *Noah v. Brillhart*, 9th Dist. Wayne No. 02CA0050, 2003-Ohio-2421, ¶ 16, and *State v. Scott*, 9th Dist. Summit No. 20834, 2002-Ohio-3199, ¶ 14.

### *Evidence Supporting the Trial Court's Decision*

**{¶19}** The following evidence was presented at the evidentiary hearing on Mary Ann's petition for a CSPO. Mary Ann testified that her home, which she shares with her husband, is situated approximately 500 yards from the Wilson family home, with one of the Wilson's fields located in between the homes. She introduced a map of the area at the hearing, which displayed that Mary Ann and her husband's property was surrounded by farmland owned by the Wilson family on three sides. The road on which both houses are located, Lyons Road, also abutted some of the Wilson's farmland. One of the Wilson's fields is located directly across Lyons Road and in front of the Lyons' home.

{¶20} Even though Mary Ann and her husband, Steven, both testified to several incidents, and introduced video and photographs involving the alleged conduct of Deborah and her sons, which consisted of the sons either riding their three-wheelers on the Lyons' property, causing stones and other debris to be propelled at the equipment, barn structures and horses, or Deborah and her sons driving by and honking, smoking their tires and/or revving their engines, and making obscene gestures or yelling vulgarities as they passed by, the trial court found two incidents specifically relevant to Mary Ann's petition for a protection order against Deborah.

*September 25, 2015 Incident*

{¶21} Mary Ann explained that prior to this incident, she and Steven had contacted law enforcement on numerous occasions regarding the Wilsons' conduct towards them and claimed that law enforcement encouraged them to begin recording the Wilsons' behavior for documentation purposes. Mary Ann testified that on this particular night she was sitting in her living room watching T.V. when she heard someone pull into her driveway in front of her home, yell obscenities, reverse, and then drive repeatedly up and down the road. (Tr. at 36). Mary Ann identified Deborah and her son, K.W., as the participants.

{¶22} Mary Ann used her cell phone to record part of this incident. This video was introduced at the hearing. The video was taken at night. Mary Ann

appears to be sitting inside her home near an open window. A loud engine is heard approaching Mary Ann's home and her dog begins to bark. A woman's voice yells "Dumb Fuck!" and the vehicle loudly speeds away. Mary Ann testified that the word "Whore" was also yelled out toward her. (Tr. at 38). Mary Ann recalled Deborah repeating this pattern of driving by, laying on the horn, and yelling obscenities approximately ten to fifteen times.

{¶23} Mary Ann called the Sheriff's Office, who responded to her home. Mary Ann showed the Deputies the video of the "Dumb Fuck" episode along with several other videos of Deborah and her sons flashing lights at their home, turning off their lights as they approached the house, spinning their tires and speeding off loudly. Deborah was charged with disorderly conduct as a result of the incident. Mary Ann hoped the disorderly conduct charge would stop the Wilsons' behavior toward her and Steven. However, Mary Ann recalled several more incidents after this involving Deborah and/or her family members which consisted of similar conduct and caused her to call the Sheriff's Office.

{¶24} Steven also provided testimony regarding this incident. However, he was outside with a friend at the "camp" on their property near the river. He could hear and see the vehicles along with the attendant commotion as they drove by, but testified that he did not "realize it was this bad until later that night." (Tr. at 78). He testified that he recognized the vehicles as those belonging to the Wilsons. He

acknowledged on cross-examination that the Wilsons were probably farming their land at this time, which explained the amount of times they drove back and forth past the Lyons' home.

*February 19, 2016 Incident*

**{¶25}** Mary Ann recalled on this day leaving her home alone in her car at 8:30 a.m. to drive to work. According to Mary Ann, Deborah immediately pulled out of her driveway and began closely tailing Mary Ann in her car. Deborah continued to follow Mary Ann in this manner and made all the same turns Mary Ann made through the town of Caledonia and on State Route 309. After several minutes, Deborah pulled into a left turn lane at an intersection, screamed vulgarities, and displayed her middle finger at Mary Ann before driving away.

**{¶26}** Mary Ann testified that she was "trembling" after Deborah turned away and debated whether to pullover and call the Sheriff's Office or continue onto work. (Tr. at 51). She did not want to be late for work, so she waited until she arrived to work to call the Sherriff. After this incident she decided to file a petition for a CSPO.

**{¶27}** Deborah, in turn, testified that the Lyons had also harassed her family for the past year, and relayed an episode her sons told her in which they claimed that Steven had jumped out from behind a tree and yelled at them. She admitted to her conduct resulting in her conviction for disorderly conduct, but claimed that she

retaliated after the Lyons had flashed lights in her family members' faces as they drove by to farm their fields. She also denied participating in any malicious conduct toward Mary Ann on February 19, 2016. She acknowledged seeing Mary Ann driving in front of her that day, but claimed that she was simply driving to work that morning, which happened to be the same route Mary Ann was taking. She asserted that her family had also been the subject of Steven's stalking by him constantly videotaping them as they passed the Lyon's home to attend to their fields.

{¶28} Deborah's husband Brian claimed that he tried to settle things with Steven, but failed to reach a resolution because Steven became overly defensive in their conversations and refused to engage in further discussion. He recalled the September 25, 2015 incident and admitted that Deborah had confronted Mary Ann and called her a name. However, he claimed that the incident was precipitated by Mary Ann flashing bright lights through the windows toward Deborah and other family members as they farmed the nearby fields.

*Mental Distress*

{¶29} Mary Ann testified that since the September 25, 2015 incident, Deborah's harassment of her had escalated culminating in the vehicle tailgating episode on February 19, 2016. Mary Ann attributed her twenty-five-pound weight loss since the September 25th incident to the mental stress caused by Deborah and her family member's conduct. She explained that she had trouble sleeping at night,

eating right, and performing her duties at work. She testified that she had sought the assistance from a doctor to help with her anxiety over this situation because she was "petrified" to be home alone and felt afraid to engage in her normal routine of feeding the animals and walking the dog in front of her house because she could not predict "what's going to happen in the road." (Tr. at 68).

{¶30} On appeal, Deborah claims that the trial court erred in granting Mary Ann's petition for a protection order because Mary Ann failed to establish her case by the preponderance of the evidence. We acknowledge that Deborah offered an explanation for the alleged instances of stalking and harassment at the evidentiary hearing. However, it is the role of the trial court to determine the weight and credibility to afford Deborah's version of the events and Mary Ann's version of the events. In this case, the trial court specifically found "the petitioner's testimony to be credible as to what happened here." (Tr. at 138). The trial court noted that Mary Ann presented a "fair amount of corroboration" in support of her case. (*Id.*) The trial court then addressed each of the elements on the record and found that Mary Ann satisfied her burden in proving the CSPO was warranted. Based upon our review, we cannot say that the trial court erred in giving more weight and credibility to Mary Ann's version of events as the record contained competent, credible evidence to support the same nor can we say for the same reason that the trial court's

decision is against the manifest weight of the evidence. Deborah's first assignment of error is overruled.

### *The Inclusion of Steven under the Protection Order*

{¶31} Deborah also assigns as error to the trial court's decision to include Steven as a protected person under the CSPO. Mary Ann's petition for a CSPO against Deborah sought relief on Steven's behalf as a family or household member. Steven's testimony at the evidentiary hearing focused on playing for the trial court numerous videos of Wilson family members driving by in various vehicles and honking or yelling at the Lyons' home. Steven explained that he set up a camera in front of their home to document these episodes, which he described as happening two to three dozen times. He claimed that he and Mary Ann were being harassed by the Wilsons' conduct toward them and he just wanted them to stop. In summarizing the incidents with the Wilsons, Steven stated that he had "witnessed quite a bit of it; however, most of it has occurred to [sic] when [Mary Ann] is alone, which is troubling." (Tr. at 103).

{¶32} Under R.C. 2903.214(C), a petitioner may seek relief for herself or may seek relief on behalf of a "family or household member." However, to be entitled to a CSPO, the petitioner must show, by a preponderance of the evidence that the respondent engaged in a menacing by stalking violation *against the person to be protected by the protection order*. R.C. 2903.214(C). Thus, in order to include

Steven as a person protected under the CSPO, Mary Ann had to prove by a preponderance of the evidence that Deborah had engaged in a menacing by stalking violation against Steven.

**{¶33}** The record demonstrates that Steven was only present for one of the two incidents the trial court identified as the basis for the pattern of conduct comprising the menacing by stalking violation because Mary Ann testified that she was alone in the vehicle when the February 19, 2016 episode occurred. Moreover, Steven testified that he was not in the home when the first incident occurred on September 25, 2015, and only realized the severity of the situation later when he spoke with Mary Ann. Finally, there was no evidence presented at the hearing to substantiate that Deborah's conduct constituting a menacing by stalking violation caused Steven to believe that Deborah would cause *him* physical harm or mental distress. Rather Steven's testimony focused on his concern over Mary Ann's mental state after these interactions with Deborah.

**{¶34}** Accordingly, we conclude that the record shows that Mary Ann failed to establish that Deborah engaged in a menacing by stalking violation against Steven as required by R.C. 2903.214(C). To this extent, we find that the trial court erred when it granted Mary Ann's request to include Steven as a person protected under the CSPO and the second assignment of error is sustained on this basis.

**{¶35}** For all these reasons, the first assignment of error is overruled and the second assignment of error is sustained to the extent of Steven's inclusion as a protected person under the CSPO. The judgment is affirmed in part and reversed in part and the cause is remanded for further proceedings consistent with this opinion.

*Judgment Affirmed in Part,*
*Reversed in Part and*
*Cause Remanded*

**PRESTON and WILLAMOWSKI, J.J., concur.**

**/jlr**