[Cite as *Montgomery v. Kleman*, 2019-Ohio-4526.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## UNION COUNTY

ERIN MONTGOMERY,

    PETITIONER-APPELLEE,              CASE NO. 14-19-04

    v.

BRENT KLEMAN,                    O P I N I O N

    RESPONDENT-APPELLANT.

Appeal from Union County Common Pleas Court
Trial Court No. 18DV0090

**Judgment Affirmed**

**Date of Decision: November 4, 2019**

APPEARANCES:

    *William Paul Bringman* **for Appellant**

    *Jessica L. Sohner* **for Appellee**

**PRESTON, J.**

{¶1} Respondent-appellant, Brent Kleman ("Kleman"), appeals the January 8, 2019 judgment of the Union County Court of Common Pleas overruling his objections to the October 2, 2018 magistrate's decision granting petitioner-appellee, Erin Montgomery ("Montgomery"), a civil-stalking-protection order ("CSPO") and a sexually-oriented-offense protection order on behalf of her son, L.M. For the reasons that follow, we affirm.

{¶2} On April 30, 2018, Montgomery filed a petition for an ex parte CSPO under R.C. 2903.214 alleging that Kleman, a 36-year-old man, had developed an inappropriate relationship with her 12-year-old son, L.M. (Doc. No. 1). Montgomery alleged that Kleman's actions constituted sexual grooming. (*Id.*). The trial court granted Montgomery's ex parte petition on May 1, 2018. (Doc. No. 2). Montgomery appeared with counsel at the full hearing before the magistrate on July 9, 2018 and August 2, 2018. (Doc. No. 35). Kleman was represented by counsel, but did not appear at the proceedings. (*Id.*).

{¶3} At the conclusion of the hearing, the magistrate issued his ruling from the bench and recommended that the trial court issue a CSPO and civil sexually-oriented-offense protection order, to remain in effect for five years. (Aug. 2, 2018 Tr. at 90-95). (*See* Doc. No. 34)

{¶4} On August 8, 2018, Kleman made a request for findings of fact and conclusions of law. (Doc. No. 32). On October 2, 2018, the magistrate issued his written magistrate's decision and findings of facts and conclusions of law in accordance with his findings at the conclusion of the hearing. (Doc. No. 35). The trial court adopted the magistrate's decision on the same date. (*Id.*). That same day, the trial court issued a protection order in accordance with the magistrate's recommendation. (*Id.*). On October 16, 2018, Kleman filed objections to the trial court's adoption of the magistrate's decision. (Doc. No. 45). On January 8, 2019, the trial court overruled Kleman's objections. (Doc. No. 62).

{¶5} On February 7, 2019, Kleman filed his notice of appeal. (Doc. No. 69). He raises two assignments of error, which we will address together.

### Assignment of Error No. I

**The trial court erred in adopting the order of the magistrate granting the civil stalking protection order and civil sexually oriented offense protection order.**

### Assignment of Error No. II

**The trial court erred in overruling the objections of Appellant to the order of the trial court adopting the order of the magistrate granting the petition for a civil stalking protection order and civil oriented offense protection order.**

{¶6} In his assignments of error, Kleman argues that the trial court erred by overruling his objections to the magistrate's decision and by adopting the magistrate's recommendation to issue a CSPO and a sexually-oriented-offense

protection order. Specifically, in his first assignment of error, Kleman argues that the trial court erred by granting the sexually-oriented-offense protection order because Montgomery's petition for relief did not put him on notice of Montgomery's allegations against him. Furthermore, Kleman argues that the trial court erred by issuing the sexually-oriented-offense protection order because the order is not consistent with Montgomery's petition for relief. In his second assignment of error, Kleman argues that the trial court erred in overruling his objections to the magistrate's decision granting the CSPO and sexually-oriented-offense protection order.

{¶7} "An appellate court reviews the trial court's decision to adopt, reject or modify the Magistrate's decision under an abuse of discretion standard." *Tewalt v. Peacock*, 3d Dist. Shelby No. 17-10-18, 2011-Ohio-1726, ¶ 31, citing *Figel v. Figel*, 3d Dist. Mercer No. 10-08-14, 2009-Ohio-1659, ¶ 9, citing *Marchel v. Marchel*, 160 Ohio App.3d 240, 2005-Ohio-1499, ¶ 7 (8th Dist.). The trial court may adopt, reject, or modify the magistrate's decision. Civ.R. 53(D)(4)(b). When ruling on objections to the magistrate's decision, the trial court is "not required to follow or accept the findings or recommendations of its magistrate." (Citations omitted.) *Stumpff v. Harris*, 2d Dist. Montgomery No. 21407, 2006-Ohio-4796, ¶ 16. Instead, the trial court "shall undertake an independent review as to the objected matters to ascertain that the magistrate has properly determined the factual issues and appropriately

-4-

applied the law." Civ.R. 53(D)(4)(d); *Stumpff* at ¶ 16. Accordingly, the trial court reviews the magistrate's decision under a de novo standard of review. *Stumpff* at ¶ 16.

{¶8} This Court reviews a trial court's decision to grant a civil protection order under an abuse of discretion standard of review. *Jenkins v. Douglas*, 3d Dist. Marion No. 9-06-55, 2007-Ohio-1909, ¶ 7; *Kramer v. Kramer,* 3d Dist. Seneca No. 13-02-03, 2002-Ohio-4383, ¶ 11. An abuse of discretion suggests that the trial court's decision is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983). "Further, if there is some competent, credible evidence to support the trial court's decision regarding a [civil protection order] petition, there is no abuse of discretion." *Warnecke v. Whitaker*, 3d Dist. Putnam No. 12-11-03, 2011-Ohio-5442, ¶ 12.

{¶9} The issuance of CSPO and civil sexually-oriented-offense protection orders is governed by R.C. 2903.214(C). Under this section, a petitioner may seek civil relief for themselves, or on behalf of a family or household member, against an alleged stalker by filing a petition containing:

> [a]n allegation that the respondent * * * engaged in a violation of
>
> section 2903.211 of the Revised Code against the person to be
>
> protected by the protection order or committed a sexually oriented

offense against the person to be protected by the protection order, including a description of the nature and extent of the violation.

R.C. 2903.214(C)(1).

{¶10} "To be entitled to a CSPO, the petitioner must show by a preponderance of the evidence that the respondent engaged in a violation of R.C. 2903.211 * * * against him or her." *Retterer v. Little,* 3d Dist. Marion No. 9-11-23, 2012-Ohio-131, ¶ 25, citing *Warnecke* at ¶ 13. Ohio's menacing-by-stalking statute states that "[n]o person by engaging in a pattern of conduct shall knowingly cause another person to believe that the offender will cause physical harm to the other person * * * or cause mental distress to the other person." R.C. 2903.211(A)(1). Accordingly, "the petitioner must establish by a preponderance of the evidence that the respondent (1) engaged in a pattern of conduct (2) that the respondent knew (3) would cause the person to be protected under the CSPO to believe that the respondent would cause the person physical harm *or* mental distress." (Emphasis sic.) *Prater v. Mullins*, 3d Dist. Auglaize No. 2-13-04, 2013-Ohio-3981, ¶ 7, citing *Retterer* at ¶ 26, citing R.C. 2903.211. "[W]here the petitioner seeks protection of a 'family or household member' under a CSPO, the petitioner must show by a preponderance of the evidence that the respondent engaged in a violation of R.C. 2903.211 against the 'family or household member' to be protected." *Retterer* at ¶ 25, citing *Luikart v. Shumate*, 3d Dist. Marion No. 9-02-69, 2003-Ohio-2130, ¶ 11.

{¶11} A "pattern of conduct" is defined as "two or more actions or incidents closely related in time, whether or not there has been a prior conviction based on any of those actions or incidents." R.C. 2903.211(D)(1). Thus, there must be more than one incident to establish a "pattern of conduct" and obtain a CSPO. *Jenkins*, 2007-Ohio-1909, at ¶ 9. Although the statute does not define the phrase "closely related in time," appellate courts have concluded that "'[i]n failing to delimit the temporal period within which the two or more actions or incidents must occur, the statute leaves that matter to be determined by the trier of fact on a case-by-case basis.'" *Wilson v. Lyon*, 3d Dist. Marion No. 9-16-17, 2016-Ohio-7734, ¶ 14, quoting *Ellet v. Falk*, 6th Dist. Lucas No. L-09-1313, 2010-Ohio-6219, ¶ 22, citing *State v. Dario*, 106 Ohio App.3d 232, 238 (1st Dist.1995).

{¶12} "A person acts knowingly, regardless of purpose, when the person is aware that the person's conduct will probably cause a certain result or will probably be of a certain nature." R.C. 2901.22(B). "A person has knowledge of circumstances when the person is aware that such circumstances probably exist." *Id.* Thus, "'[a] petitioner seeking a CSPO under [Ohio's menacing-by-stalking statute] is not required to prove purpose or intent to cause physical harm or mental distress.'" *Echemann v. Echemann*, 3d Dist. Shelby No. 17-15-19, 2016-Ohio-3212, ¶ 36, quoting *Retterer* at ¶ 35, citing *Ellet* at ¶ 30.

{¶13} A petitioner is not required to demonstrate that he or she actually suffered physical harm. *See* R.C. 2903.211(A)(1); *Wilson* at ¶ 16. Rather, "[t]he petitioner merely has to demonstrate that the respondent knowingly caused the petitioner to believe that the respondent would cause him or her physical harm." *Wilson* at ¶ 16, citing R.C. 2903.211(A)(1). R.C. 2903.211(D)(2) defines "mental distress" as any of the following: "[a]ny mental illness or condition that would normally require psychiatric treatment, psychological treatment, or other mental health services, whether or not any person requested or received psychiatric treatment, psychological treatment, or other mental health services."

{¶14} "[M]ental distress for purposes of menacing by stalking is not mere mental stress or annoyance." *Caban v. Ransome*, 7th Dist. Mahoning No. 08 MA 36, 2009-Ohio-1034, ¶ 29. "While R.C. 2903.211(D)(2) requires evidence that the person to be protected under the CSPO developed a mental condition that involved some temporary substantial incapacity or that would normally require mental health services, the statute does not, however, require proof that the victim sought or received treatment for mental distress." *Wilson*, 2016-Ohio-7734, at ¶ 17, citing *State v. Szloh*, 189 Ohio App.3d 13, 2010-Ohio-3777, ¶ 27 (2d Dist.). "Nor does the statute require that the mental distress be totally or permanently incapacitating or debilitating." *Retterer*, 2012-Ohio-131, at ¶ 41. However, "[i]ncapacity is

substantial if it has a significant impact upon the victim's daily life." *State v. Horsely*, 10th Dist. Franklin No. 05AP-350, 2006-Ohio-1208, ¶ 48.

{¶15} We begin by addressing Kleman's first assignment of error, in which he argues that the trial court erred by issuing an order that is not consistent with Montgomery's petition for relief.[1] Specifically, Kleman argues that the trial court erred by granting both a CSPO and a sexually-oriented-offense protection order because Montgomery indicated on her petition that she was seeking a CSPO and did not indicate that she was also seeking a sexually-oriented-offense protection order. Thus, Kleman argues that because Montgomery did not mark the box on the standardized form relating to sexually-oriented offenses, he was not put on notice that Montgomery was going to present evidence that Kleman committed sexually-oriented offenses. We disagree.

{¶16} Contrary to Kleman's argument, we find that he was put on sufficient notice of the allegations against him. "[T]he essential elements of due process are notice and an opportunity to respond." *Lindsay v. Jackson*, 1st Dist. Hamilton Nos. C-990786 and A-9905306, 2000 WL 1268810, * 2 (Sept. 8, 2000). "The notice must be reasonably calculated, under all the circumstances, to apprise interested

---

[1] We note that Kleman's first objection to the magistrate's decision, which is partially the subject of his second assignment of error, dealt with this same issue. Thus, in addressing Kleman's first assignment of error, we also consider an element of his second assignment of error.

parties of the pendency of the action and to afford them an opportunity to present their objections." *Id.*

**{¶17}** Here, the record indicates that Kleman had sufficient notice of the nature of the allegations against him. First, the verbiage of the petition itself put Kleman on notice of the sexual nature of Montgomery's allegations. Montgomery stated in the petition that she was seeking protection on behalf of her son, L.M., due to concerns regarding "possible sexual abuse." (Doc. No. 1). Moreover, Montgomery alleged in her petition that Kleman engaged in "highly inappropriate" text message conversations with L.M., that he spent "significant money" on gifts for L.M., and that she believed Kleman's actions constituted "sexual grooming." (*Id.*). Moreover, the record indicates that the parties engaged in extensive discovery in preparation for the hearing. (*See* Doc. Nos. 16, 19, 20, 22, 26). Finally, as will be discussed in detail below, the evidence Montgomery presented at the hearing was consistent with the allegations contained in the petition. (*See* Doc. No. 1). Thus, the record indicates that the petition provided Kleman ample notice of the conduct which gave rise to Montgomery's concerns, including her allegations that Kleman engaged in sexual grooming of L.M.[2]

---

[2] Because Kleman only challenged the sufficiency of the petition and did not challenge the sufficiency of the evidence regarding the trial court's issuance of a sexually-oriented-offense protection order, we do not address the sufficiency of the evidence for the civil sexually-oriented-offense protection order. (*See* Appellant's Brief at 10-20).

{¶18} Having concluded that Montgomery's petition afforded Kleman sufficient notice, we now turn to the balance of Kleman's second assignment of error, in which he argues that the trial court erred by overruling his objections to the magistrate's decision. In his second objection to the magistrate's decision, Kleman argued that because the petition sought a CSPO,[3] Montgomery was required to demonstrate that Kleman engaged in a violation of R.C. 2903.211 against L.M. Kleman alleged that Montgomery failed to meet this burden of proof. (Doc. No. 45). Specifically, Kleman argued that the magistrate erred by determining that Kleman's text message communications with L.M. constituted a pattern of conduct. (*Id.*). In his third objection, Kleman argued that the magistrate erred by recommending the trial court issue a CSPO because Montgomery failed to provide sufficient evidence that Kleman's actions were directed at L.M. (*Id.*). In his fourth objection, Kleman argued that the magistrate erred in considering the testimony of C.K., one of Kleman's relatives, that he was sexually abused by Kleman because the alleged sexual abuse was not directed at L.M. and was not closely related in time to establish a pattern of conduct with respect to Kleman's actions directed toward L.M. (*Id.*).

---

[3] To the extent that Kleman's second assignment of error addresses concerns regarding the sufficiency of the petition, we note that we addressed concerns about the sufficiency of Montgomery's petition in our discussion of the first assignment of error. (*See* Appellant's Brief at 18-20).

{¶19} Kleman's fifth objection concerned Detective Dennis Flanagan's ("Detective Flanagan") testimony that Kleman's actions did not rise to the level of criminal conduct. (*Id.*). Kleman contended that because Detective Flanagan testified that no criminal conduct occurred, Montgomery did not demonstrate that Kleman violated R.C. 2903.211. (*Id.*). Thus, Kleman argued that the magistrate erred by granting Montgomery's petition for a CSPO. (*Id.*).

{¶20} Kleman argued in his sixth objection that Montgomery failed to present sufficient evidence that L.M. experienced mental distress. (*Id.*). Specifically, Kleman contended that the magistrate erred by granting Montgomery's petition when she did not present testimony that whatever stress L.M. suffered as a result of Kleman's actions would normally require psychiatric treatment. (*Id.*). In his seventh objection, Kleman argued that the magistrate erred in granting Montgomery's petition for a CSPO because the record is devoid of evidence that Kleman knew that he would cause L.M. mental distress by sending him text messages. (*Id.*). In his eighth objection to the magistrate's decision, Kleman further argued that the magistrate erred in granting Montgomery's petition for a CSPO because Montgomery failed to present any evidence that L.M. actually experienced mental distress. (*Id.*). Specifically, Kleman argued that Elise Whaley ("Whaley"), L.M.'s teacher, was not qualified to testify that L.M.'s personality change was related to Kleman's communication with L.M. In his ninth objection, Kleman

argued that because L.M. did not testify, Montgomery did not present sufficient evidence to meet her burden of proof. (*Id.*). Kleman argued that without L.M. providing testimony regarding his mental state, the magistrate erred by granting Montgomery's petition for a CSPO because the magistrate did not have sufficient evidence upon which to determine that Kleman caused mental distress to L.M. (*Id.*).

{¶21} After reviewing the record, we conclude that the trial court did not err by overruling Kleman's objections. At the hearing, Montgomery testified that she has been friends and neighbors with Kleman and his wife, Jessica Kleman ("Jessica"), for 15 years. (Aug. 2, 2019 Tr. at 22-24). Montgomery testified that in March or April 2016, Kleman and Jessica were in the process of building a new home and were having difficulty finding a temporary place to live. (*Id.* at 25-26). Montgomery attested that she offered for Kleman and Jessica to live with her and her family during this time period. (*Id.* at 25-26). Consequently, Kleman and Jessica lived with the Montgomery family from March or April 2016 to October 2016. (*Id.*).

{¶22} Montgomery stated that she noticed a drastic change in L.M. and Kleman's relationship when Kleman was living in her home and in the time thereafter. (*Id.* at 25). Montgomery testified that during this time, she noticed that Kleman and L.M. became particularly close and that Kleman demonstrated a preference for L.M. (*Id.* at 26). Montgomery testified that after Kleman and Jessica

moved out of the Montgomery home, L.M. wanted to spend all of his time with Kleman and the pair were "basically inseparable" during that time. (*Id.* at 27-29). The pair was "constantly" together, including overnight. (*Id.* at 30).

{¶23} Beginning in the summer of 2017, Montgomery and Josh Montgomery ("Josh"), Montgomery's husband, began to notice troubling aspects of Kleman and L.M.'s relationship. (*Id.* at 30-31). For instance, Montgomery stated that Kleman admitted to her that he allowed L.M. to drive his vehicle on the road, and Kleman also admitted that he took L.M. and some of his friends out to "toilet paper" and "egg" neighborhood homes. (*Id.* at 31-33). Montgomery also became concerned with the volume and quality of gifts Kleman bought for L.M. (*Id.* at 34). For instance, Kleman bought L.M. a "Hoverboard" valued at approximately $400 and was constantly buying L.M. new shoes and clothes. (*Id.* at 28, 34). Montgomery testified that on at least three occasions, she had conversations with Kleman to express her concerns. (*Id.* at 33).

{¶24} Montgomery also described a bedroom at the Kleman's home referred to as "[L.M.]'s bedroom." (*Id.* at 34). Montgomery described the room as having multiple televisions, a hammock hanging from the ceiling, and a large chest labeled "Airsoft 4 [L.M.]," which held dozens of Airsoft guns Kleman purchased for L.M. without Josh or Montgomery's consent or knowledge. (*Id.*). The bedroom also

housed an entire wardrobe for L.M., including multiple pairs of shoes, which Montgomery was unaware of at the time. (*Id.*).

{¶25} Montgomery testified that she noticed another change in Kleman and L.M.'s relationship during the winter of 2017-2018. (*Id.* at 36). During this time, Montgomery noticed that L.M. no longer wanted to go to Kleman's house alone and did not want to spend time with him. (*Id.*). Montgomery further stated that she noted that L.M. demonstrated a lack of interest in basketball, his favorite sport, and Montgomery even spoke to L.M.'s coach regarding L.M.'s loss of motivation on the basketball court. (*Id.* at 49). Montgomery testified that her family went on vacation over the school holiday break and during that time, L.M. was not paying attention to his phone. (*Id.* at 37). Consequently, Montgomery noticed a large volume of text messages coming in on L.M.'s phone from Kleman that L.M. was not interested in responding to. (*Id.*). Several weeks later, soon after school resumed, Montgomery received an email from Whaley expressing concern about L.M.'s behavior in school. (*Id.*). As punishment, Montgomery took L.M.'s phone away. (*Id.* at 37-38). Subsequently, Montgomery noticed Kleman continued to send text messages to L.M. (*Id.* at 38). Montgomery became concerned and reviewed the text messages between L.M. and Kleman from the time period of October 2017 to January 2018. (*Id.* at 38-39). After reviewing the content, Montgomery became "extremely distraught and concerned." (*Id.*).

{¶26} The following text messages are representative of the text messages Kleman sent to L.M.:

Two questions (1) Do you think you can stay here tonight after the haunted house? (2) Jess says she is willing to drive so I could watch the movie with you guys. But I only want [to] if I can be next to you in the truck, so [l]et me know.

* * *

Are you alive?  You said you were going to text me yesterday, [did] you forget me again?  BUTHEAD [sic] WTF

* * *

[The money] is just for you right? Your [sic] not giving it away right? Just to explain: I only say the using thing only because you don't ever want to talk to me…That's why I ask for you to talk to me in return for giving you [money]. * * * Or in other words[,] I do not want to be buying things for you to give away [to] other people, only making you happy is what I want to spend [money] on[.]

* * *

Please please please stay in touch, I would like to talk to you about more than just [money].  I know you hate what I am about to say but

to [sic] bad!  I love you buddy and I really like being your * * * friend[.]

* * *

[Good night,] [L.M.], [I] hope to have you around this weekend, Jess works all weekend[.]

* * *

I don't like fighting with you.  I have spent so much on that [dumb] game and it only keeps you further away.  I can't even buy your love now.

* * *

If all the stuff I bought you was gone tomorrow, how would you feel about me?  All of it[.]  Would you still love me?  I am trying to figure out what is more important to you[,] the stuff [I] buy you or me.  Sorry, it hurts!

* * *

"It's been a long day without you my friend."  * * * That was [meant] to be a little funny yet serious… [You] [p]robably think that I am stupid…sorry if so[.] * * * Sorry if I creeped you out with the song quote.  It came on and I thought of you[.]

* * *

Ok, I just care about you, possibly [too] much I guess… Sorry if I am over the top. When you were able to spend more time with me [I] didn[']t text you so much[.] [Plus] you told me that you would text me a lot[.]

* * *

I wanted to text you [earlier] this afternoon but I am trying to do what you wanted, sorry. Miss you buddy ** * and I hope that it's ok that I text you.

* * *

Sorry for being upset, and raging… You know just how to get [me] mad..

* * *

Why are you not talking to me? Everything ok[?] ** * FU WTF[?] Really, no response[?] What are you doing? Forget it, I am done anyway.

* * *

You know you really f'ing suck. I don't get you at all[.]

* * *

Hey buddy, if I have made you mad or [I] am texting [too] much again

I am sorry!!!!! * * * I will try [to] hold the [text messaging] to telling

you goodnight, that's still important to me! Talk to you soon.

* * *

Love you buddy and GOODNIGHT! I know that you hate it, but

please just go with it…. The love you thing…[it has] been a [kind of]

crappy day for me. Don't worry about it though. Just goodnight and

know I care about you.

* * *

This is what I have been talking about, why can't we be friends[?] I

don't treat you like this. I give you [whatever] you want and yet you

shit on me every chance you get[.]

(Petitioner's Ex. B).

{¶27} As a result of her concerns, Montgomery forwarded the text message communications between Kleman and L.M. to the police to investigate. (Aug. 2, 2018 Tr. at 40). Montgomery testified that the police interviewed L.M. and some of his friends during the course of the investigation. (*Id.* at 43). Montgomery testified that in March 2018, the investigation was closed, and it was her understanding that Kleman agreed to have no further communication with L.M. (*Id.* at 43-44).

**{¶28}** Montgomery testified that in the spring of 2018, she overheard a conversation between L.M. and a friend that caused her to believe that Kleman contacted L.M. (*Id.* at 45). Montgomery stated that although she could not find the text messages on L.M.'s phone, a review of a report from her cellular service provider showed that there had been additional text message communications with L.M. that had been deleted. (*Id.* at 45-46). Montgomery stated that when she confronted L.M. with the additional text message communication, he became very upset. (*Id.* at 47). Montgomery testified that L.M. told her that Kleman instructed him to delete the text messages. (*Id.* at 47-48). Kleman also admitted that he met up with L.M. and gave him gifts after he told the investigators that he was going to cease all contact with L.M. (*Id.* at 48).

**{¶29}** Montgomery testified that she believes that L.M.'s relationship with Kleman was causing L.M. distress. (*Id.* at 48-49). In support of this position, Montgomery stated that she observed changes in L.M.'s behavior and school performance that coincided with changes in his communication with Kleman. (*Id.* at 49-50). Montgomery stated that L.M.'s demeanor, attitude, and engagement with his family improved significantly when he was no longer communicating with Kleman. (*Id.* at 49). Montgomery further testified that L.M.'s academic and athletic performance and relationships with his friends significantly improved once the

communication between L.M. and Kleman ceased. (*Id.*). Montgomery further stated that L.M. exhibited a renewed interested in basketball. (*Id.*).

**{¶30}** Montgomery testified that L.M. is in mental health counseling for psychological issues resulting from L.M.'s relationship with Kleman. (*Id.* at 49-50, 73-77). Montgomery stated that she believed that the psychological issues began to manifest during the time that L.M. began to pull away from Kleman, but Kleman continued to contact him. (*Id.* at 50, 77).

**{¶31}** Detective Flanagan, a detective with the Marysville Police Department Investigations Unit, identified Petitioner's Exhibit B as a copy of L.M.'s cell phone download report that he reviewed during the course of his investigation. (July 9, 2018 Tr. at 60-61, 118-119). (*See* Petitioner's Ex. B). Detective Flanagan testified that he was concerned with the volume of text messages Kleman sent to L.M., which numbered approximately 850. (July 9, 2019 Tr. at 119-120). (*See* Petitioner's Ex. B). Detective Flanagan also testified that he was concerned about the content of the text messages, including Kleman's professions of love for L.M., his use of profanity, and the number of occasions that Kleman would ask to spend time with L.M. (July 9, 2019 Tr. at 120-123). (*See* Petitioner's Ex. B). Also troubling to Detective Flanagan were text messages indicating that Kleman hoped to buy L.M.'s love with gifts and money. (July 9, 2018 Tr. at 125-127). (*See* Petitioner's Ex. B). Moreover, the content of the text messages led Detective Flanagan to believe that many of the

messages were not wanted by L.M. (July 9, 2018 Tr. at 128-130). (*See* Petitioner's Ex. B).

{¶32} Detective Flanagan testified that he interviewed Kleman on March 16, 2018. (July 9, 2018 Tr. at 64-65). Detective Flanagan recounted that during the interview, Kleman admitted that L.M. and L.M.'s friends watched pornography at Kleman's house while in their underwear or while naked in the hot tub. (*Id.* at 65-66). Kleman also admitted that he gave L.M. massages and was involved in a rather extensive text messaging relationship with him. (*Id.*). Kleman further acknowledged that he provided L.M. an ATM card associated with Kleman's account for L.M. to use. (*Id.* at 69). Detective Flanagan testified that at the conclusion of the interview, Kleman admitted that he perhaps "extended some boundaries" with respect to L.M. and assured Detective Flanagan that he would have no further contact with L.M. (*Id.* at 68-69). Detective Flanagan stated that at the end of his first investigation, he concluded that Kleman's behavior was "very suspicious," but he did not find any criminal offense to charge him with based on his behavior toward L.M. and so he closed the investigation. (*Id.* at 69-70).

{¶33} Detective Flanagan testified that he reopened the investigation in May 2018 when the Montgomery family discovered the new series of text messages exchanged between L.M. and Kleman. (*Id.* at 70). Detective Flanagan stated that the messages had been deleted and were unable to be recovered. (*Id.* at 70-71).

Detective Flanagan further testified that after the case was reopened, he became aware of additional concerning allegations against Kleman, including an allegation that Kleman was not only aware that L.M. and his friends watched pornography at Kleman's house, but that Kleman would watch the pornography with the boys and put the pornographic films in the video player on occasion. (*Id.* at 73-74). Detective Flanagan testified that the second investigation was still pending at the time of the hearing. (*Id.* at 71).

{¶34} Detective Flanagan testified that he is familiar with the term "sexual grooming" and described it as behavior exhibited by sexual predators where they establish some type of trust or bond with a potential victim over a period of weeks, months, or longer. (*Id.* at 62-63). Detective Flanagan stated that the goal of sexual grooming is to create a sense of trust or comfort with the potential victim so that when the predator does attempt to perpetrate against the potential victim, the bond established makes the victim less likely to resist the sexual advances and disclose the abuse. (*Id.* at 63, 96-97). Detective Flanagan testified that in his opinion, the contact between Kleman and L.M. was consistent with sexual grooming. (*Id.* at 73). Detective Flanagan opined that while Kleman gave him explanations for his conduct, the extent of his behavior was too significant to be explained away. (*Id.*). Detective Flanagan testified that the lack of disclosure to L.M.'s parents of the extent of the text messaging and gifts was consistent with sexual grooming. (*Id.*).

Moreover, Detective Flanagan testified that he was concerned that Kleman continued to contact L.M. after Detective Flanagan's interview with Kleman where Kleman was "adamant" that he would have no further contact with L.M. (*Id.* at 92). Detective Flanagan stated that in his experience with investigating cases involving child predators, they cannot stop themselves from making contact with children. (*Id.*). Thus, Detective Flanagan opined that Kleman's behavior in continuing to contact L.M. after insisting that he was going to have no further contact with the boy was consistent with the behavior of a sexual predator. (*Id.*). Detective Flanagan further testified that the content of Kleman's text messages to L.M. was consistent with sexual grooming. (*Id.* at 129).

{¶35} Detective Flanagan opined that Kleman should not have any further contact with L.M. (*Id.* at 74). On cross-examination, Detective Flanagan stated that he did not find anything in the investigation to lead him to believe that Kleman knowingly caused L.M. to be stressed. (*Id.* at 77). Detective Flanagan also stated that he did not find anything in the text message communications that gave him concern that Kleman harmed L.M. (*Id.*).

{¶36} C.K., Kleman's adult nephew, testified that he was sexually molested multiple times by Kleman when C.K. was approximately four years old. (*Id.* at 14, 16-18). C.K. testified that after the sexual abuse, Kleman would reward him with candy and treats. (*Id.* at 18). C.K. stated that Kleman's interactions with L.M. were

similar to Kleman's interactions with him during the time he was being sexually abused. (*Id.* at 21-22, 31-33).

{¶37} C.K. testified that he observed Kleman's favoritism of L.M. and the many expensive gifts Kleman purchased for the boy. (*Id.* at 19-23). C.K. stated that he was present with L.M. when L.M. received text messages from Kleman and testified that C.K. observed L.M.'s character and body language change in response to the communication. (*Id.* at 32-33). C.K. testified that it appeared that the text messages from Kleman caused L.M. to become annoyed and stressed. (*Id.*).

{¶38} Samantha Kleman ("Samantha"), C.K.'s sister and Kleman's niece, testified that she witnessed Kleman driving while L.M. sat in his lap. (*Id.* at 51-54). Samantha stated that it appeared that L.M. was uncomfortable and jumped off of Kleman's lap immediately after the car parked. (*Id.* at 52-53). Samantha further testified that she witnessed Kleman pull L.M. onto his lap while they were in a hot tub with some of L.M.'s friends, and she noted that L.M. appeared uncomfortable and got out of the hot tub quickly following the incident. (*Id.* at 54-55). Samantha also witnessed Kleman pull L.M. onto his lap on another occasion when the pair was sitting on a couch. (*Id.* at 54).

{¶39} Mike Best ("Best"), a friend of the Montgomery family who has a son the same age as L.M., corroborated the other witnesses' testimony that Kleman showed a preference for L.M. over the other neighborhood boys and showered L.M.

with lavish gifts. (*Id*. at 133-138). Best testified that he observed that when Kleman's relationship with L.M. intensified, L.M., who is usually an easygoing child, experienced a drastic behavioral change and began to act out. (*Id*. at 144). Best testified that he witnessed L.M. isolate himself from his friends during this time. (*Id*. at 143). Best opined that Kleman's actions caused L.M. to experience mental stress. (*Id*. at 143-144).

{¶40} Whaley, L.M.'s math teacher during the 2017-2018 school year, testified that she observed a shift in L.M.'s behavior following Christmas break. (Aug. 2, 2018 Tr. at 5-8). Whaley stated that after Christmas break, L.M. began to display disrespectful and rude behavior, refused to complete any work, and began to fall asleep regularly in class. (*Id*. at 7-9). L.M. also began frequently complaining of headaches and requesting to visit the school nurse's office. (*Id*. at 7-8). Whaley testified that the behaviors that she observed after Christmas break were not characteristic of L.M. (*Id*. at 8). She further testified that in her 12 years of teaching experience, the extent and chronic nature of L.M.'s behavior was not consistent with typical adolescent behavior. (*Id*. at 9). As a result of her observations, Whaley sent an email to L.M.'s parents expressing her observations and concerns. (*Id*. at 8-9).

{¶41} Whaley testified that L.M.'s concerning behaviors continued through the end of February 2018. (*Id*. at 10-11, 14-15). Whaley stated that at the end of February 2018, she noticed a marked improvement in L.M.'s behavior and academic

performance that continued through the remainder of the 2017-2018 academic year. (*Id.*). Additionally, L.M. no longer fell asleep in class or complained of headaches. (*Id.* at 11). Finally, Whaley stated that she never learned the cause of L.M.'s concerning behavior in January and February 2018. (*Id.* at 13-14).

{¶42} With respect to the first element of menacing by stalking, Montgomery established by a preponderance of the evidence that Kleman engaged in a "pattern of conduct." Montgomery presented evidence that Kleman engaged in extensive text message conversations over a span of several months with L.M. On numerous instances throughout the text message conversations, Kleman requested that L.M. communicate with him and Kleman expressed anger when L.M. did not send him a satisfactory number of text messages. Additionally, on several occasions, Kleman professed love for L.M. while acknowledging that his expressions of love made L.M. uncomfortable. Additionally, the text message conversations establish that Kleman hoped to establish a quid pro quo with L.M. where Kleman would give L.M. money and gifts in exchange for L.M. exchanging text messages with him. In Kleman's own words, he was attempting to "buy [L.M.]'s love." Kleman also acknowledged in the text messages that L.M. requested that Kleman limit the number of text messages he sent to L.M. Moreover, the tone and nature of the text messages were inappropriate for the relative ages of the parties.

{¶43} Moreover, Montgomery and Detective Flanagan testified that after Kleman vowed that he would no longer contact L.M., Kleman continued to exchange approximately 75 text messages with L.M., which Kleman instructed L.M. to delete. Samantha also testified that on at least three separate occasions she witnessed Kleman pull L.M. onto his lap and that L.M. appeared uncomfortable with the physical contact from Kleman. Montgomery also testified that she witnessed L.M.'s uncomfortable reactions to Kleman invading L.M.'s personal space.

{¶44} Montgomery, Samantha, Best, C.K., and Kleman testified that Kleman purchased expensive and extravagant gifts for L.M., far in excess of the gifts he gave to others. Furthermore, Montgomery testified that she was initially unaware of the extent of the gifts or the text messages. In addition, Detective Flanagan testified that Kleman admitted to giving L.M. massages, permitting L.M. to view pornographic films, allowing L.M. to bathe nude in his hot tub, and providing L.M. a debit card attached to Kleman's account for L.M.'s personal use. Detective Flanagan testified that, in his opinion, Kleman's behaviors were consistent with sexual grooming. Detective Flanagan further testified that Kleman's requests that L.M. conceal the extent of the gifts and the text message conversations with L.M.'s parents concerned him and was consistent with sexual grooming.

{**¶45**} Given the testimony presented, we conclude that a trier of fact could find by a preponderance of the evidence that Kleman engaged in a pattern of conduct. The lavish gifts, extent and nature of the text message communications with L.M., Kleman's sexual grooming behavior, and his repeated physical contact with L.M. provided ample evidence for the trial court to conclude that Kleman engaged in a pattern of conduct. *See McWilliam v. Dickey*, 8th Dist. Cuyahoga No. 99277, 2013-Ohio-4036, ¶ 30 ("""[A] court must take everything into consideration when determining if a respondent's conduct constitutes a pattern of conduct, even if some of the person's actions may not, in isolation, seem particularly threatening."""), quoting *Guthrie v. Long*, 10th Dist. Franklin No. 04AP-913, 2005-Ohio-1541, ¶ 12, quoting *Miller v. Francisco*, 11th Dist. Lake No. 2002-L-097, 2003-Ohio-1978, ¶ 11, *overruled on other grounds*, *Davis v. DiNunzio*, 11th Dist. Lake No. 2004-L-106, 2005-Ohio-2883, ¶ 22. Thus, we agree with the trial court that Montgomery showed by a preponderance of the evidence that Kleman engaged in a pattern of conduct directed at L.M. Therefore, the trial court did not err by overruling Kleman's second and third objections to the magistrate's decision.

{**¶46**} However, Kleman argues in his fourth objection to the magistrate's decision that the magistrate erred by considering C.K.'s testimony that he was sexually abused by Kleman. Kleman contends that because the alleged sexual abuse of C.K. occurred approximately 20 years prior to the incidents involving L.M., it

was not "closely related in time." Moreover, Kleman argues that the alleged sexual abuse was not directed at L.M. and was, therefore, not relevant to Montgomery's petition for a CSPO on behalf of L.M. However, assuming (without deciding) that C.K.'s testimony regarding Kleman's alleged sexual abuse was not relevant to Montgomery's petition, Kleman's argument still fails. As detailed above, even without C.K.'s testimony of Kleman's alleged abuse, Montgomery presented ample evidence that Kleman engaged in a pattern of conduct directed toward L.M. Therefore, even if the magistrate did err by considering C.K.'s testimony concerning the alleged sexual abuse, the error was harmless. Therefore, the trial court did not err in overruling Kleman's fourth objection to the magistrate's decision.

**{¶47}** Furthermore, Kleman argues in his fifth objection to the magistrate's decision that because Detective Flanagan testified that "nothing he reviewed in his investigation disclosed any criminal conduct was committed by [Kleman]," the trial court erred in granting a CSPO against Kleman. We disagree. First, Kleman misrepresents Detective Flanagan's testimony. Detective Flanagan did testify that his agency determined at the conclusion of the first investigation in March 2018 that Kleman's conduct did not rise to the level of a criminal offense. However, Detective Flanagan testified that the agency reopened the investigation when Montgomery discovered that Kleman was continuing to contact L.M. despite his insistence that he would cease communications. Detective Flanagan further testified that during

the subsequent investigation, they were made aware of additional troubling allegations against Kleman, such as the allegation that Kleman actively furnished pornography to L.M. and his friends. Detective Flanagan testified that the second investigation was still open at the time of the hearing. Furthermore, although Detective Flanagan offered his opinion on whether Kleman's actions constituted criminal conduct, Detective Flanagan's opinion is not determinative.

{¶48} Moreover, R.C. 2903.211(D)(1) explicitly defines a pattern of conduct, for the purpose of obtaining a CSPO, as "two or more actions or incidents closely related in time, *whether or not there has been a prior conviction based on any of those actions or incidents*." (Emphasis added.) Thus, the statute specifically provides that a respondent's behavior need not have resulted in a criminal conviction to constitute a "pattern of conduct." Therefore, the trial court did not err by determining that Kleman's actions constituted a pattern of conduct despite Detective Flanagan's testimony regarding his opinion of whether Kleman's behavior constituted a criminal offense. Thus, the trial court did not err by overruling Kleman's fifth objection to the magistrate's decision.

{¶49} With respect to the second element of menacing by stalking, Montgomery established by a preponderance of the evidence that Kleman knew that his actions would cause L.M. physical harm or mental distress. First, Kleman's text message communications make clear that he was aware that he was causing L.M.

mental distress. For instance, in several of the text message communications, Kleman acknowledged that L.M. "hate[s]" when Kleman tells the boy that he loves him, yet he continues to make professions of love anyway. (Petitioner's Ex. B). In the text messages, Kleman also acknowledged several times that L.M. had requested that Kleman stop texting him with the same frequency, but that he continued to send L.M. frequent text messages and demand frequent text messages in return. Additionally, Kleman admonished L.M., sometimes with profanity, when he did not send a sufficient number of text messages to him. In multiple text messages, Kleman acknowledged that he was being mean to L.M. and apologized for his behavior, yet he still continued to send harsh messages to L.M. Thus, Kleman's own words establish that he was aware that his conduct was causing L.M. distress.

{¶50} Moreover, Detective Flanagan testified that during the first police investigation, Kleman admitted that he had "extended some boundaries" with L.M. and vowed to end contact with him. However, Kleman again communicated with L.M. despite being on notice that L.M. and the Montgomery family were concerned about his relationship with L.M.

{¶51} Despite Kleman's argument to the contrary in his seventh objection to the magistrate's decision, given the testimony presented, we find that a trier of fact could find by a preponderance of the evidence that Kleman knew his actions would cause L.M. physical harm or mental distress. Thus, the trial court did not err in

determining that Montgomery presented ample evidence to satisfy the second element of menacing by stalking and overruling Kleman's seventh objection to the magistrate's decision.

{¶52} Kleman's sixth, eighth, and ninth objections allege that Montgomery did not establish by a preponderance of the evidence that L.M. experienced mental distress as a result of Kleman's actions.

{¶53} After reviewing the record, we find that the trial court could have reasonably concluded that Montgomery demonstrated by a preponderance of the evidence that Kleman caused L.M. mental distress. Although L.M. did not testify at the hearing, a number of individuals presented testimony of a drastic change in L.M.'s behavior that corresponded to the period of time when Kleman was continuing to contact L.M. after L.M. had withdrawn from the relationship. Montgomery testified that for a period of time, L.M. appeared eager to spend time with Kleman. However, Montgomery further testified that she observed L.M. begin to drastically pull away and lose interest in the relationship.

{¶54} Whaley, who had the opportunity to observe L.M. every school day during the period of time when L.M. was no longer interested in communicating with Kleman, testified that she observed a drastic and troubling change in L.M.'s behavior during this time that was not typical of L.M. or teenage boys in general. Whaley testified that following the Christmas holidays during the 2017-2018 school

year, L.M. frequently fell asleep in class, complained of headaches, showed a lack of interest and motivation with respect to his school work, and adopted a defiant attitude. Whaley also testified that in late February 2018, which corresponds with the time period following the first investigation when Kleman was no longer communicating with L.M., she observed positive changes in L.M. During this time, L.M. became more engaged in his school work, no longer fell asleep during class, stopped complaining of headaches, and exhibited a significantly improved attitude.

{¶55} Moreover, Best testified that in addition to observing changes in L.M.'s attitude, he also observed changes in L.M.'s level of involvement with his friends. Best testified that during the time that Kleman was sending L.M. unwanted text messages, he observed L.M. pull away from his relationships with his friends. *See Smith v. Wunsch*, 162 Ohio App.3d 21, 2005-Ohio-3498, ¶ 20 (4th Dist.) (noting that evidence of a change in routine can corroborate a finding of mental distress).

{¶56} Additionally, Montgomery testified that during the time period that L.M. was receiving unwanted communication from Kleman, L.M. was distant from his family and demonstrated a lack of interest in basketball, his favorite sport. Montgomery further stated that once the text message communications temporarily stopped in response to the police investigation, L.M. was once again engaged with his family and friends and demonstrated renewed interest in basketball. Moreover, Montgomery and C.K. testified that they observed L.M. appear upset when he

received text messages from Kleman. Furthermore, Montgomery testified that as a result of Kleman's actions, L.M. is enrolled in mental health counseling. Given this evidence, we find that the trial court could have reasonably concluded that Kleman's behavior caused L.M. to experience mental distress. Thus, we also find that the trial court did not err by overruling Kleman's sixth and eighth objections to the magistrate's decision.

{¶57} In his ninth objection to the magistrate's decision, Kleman argued that the magistrate erred by recommending that the trial court issue the CSPO because L.M. himself did not testify as to his mental state during the hearing. We disagree. Kleman argues that because L.M. is the only person able to testify to his mental processes in response to Kleman's actions, his testimony was required to establish that Kleman caused him mental stress. However, we find that Montgomery's, Whaley's, and Best's testimony describing changes in L.M.'s behavior corresponding with L.M.'s reluctance to communicate with Kleman supports a finding that L.M. experienced mental distress as a result of Kleman's pattern of conduct. *See R.G. v. R.M.*, 7th Dist. Mahoning No. 17 MA 0004, 2017-Ohio-8918, ¶ 17 ("The fact-finder can rely on personal experience and knowledge to determine if the offender caused the requisite mental distress to the victim."). Thus, we conclude that the trial court did not err in overruling Kleman's ninth objection to the magistrate's decision.

{¶58} In light of the foregoing, we conclude that the trial court did not abuse its discretion when it overruled Kleman's objections or when it granted Montgomery's petition for a CSPO and a sexually-oriented-offense protection order.

{¶59} Accordingly, Kleman's first and second assignments of error are overruled.

{¶60} Having found no error prejudicial to the appellant herein in the particulars assigned and argued, we affirm the judgment of the trial court.

***Judgment Affirmed***

**SHAW and WILLAMOWSKI, J.J., concur.**